# United States Court of Appeals for the Federal Circuit

05-1404, -1417

NIPPON STEEL CORPORATION, NKK CORPORATION,
KAWASAKI STEEL CORPORATION, and TOYO KOHAN CO., LTD.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

MITTAL STEEL USA ISG INC.,

Defendant-Appellant.

James P. Durling, Willkie Farr & Gallagher, LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Daniel L. Porter and Robert E. DeFrancesco.

Neal J. Reynolds, Assistant General Counsel for Litigation, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellant United States. With him on the brief was James M. Lyons, General Counsel.

Terence P. Stewart, Stewart and Stewart, of Washington, DC, argued for defendant-appellant Mittal Steel USA ISG Inc. With him on the brief were Eric P. Salonen, Patrick J. McDonough, and Sarah V. Stewart.

John J. Mangan, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for amicus curiae United States Steel Corporation. With him on the brief were Robert E. Lighthizer, James C. Hecht, and Stephen P. Vaughn.

Appealed from: United States Court of International Trade

Chief Judge Jane A. Restani

# United States Court of Appeals for the Federal Circuit

05-1404, -1417

NIPPON STEEL CORPORATION, NKK CORPORATION,
KAWASAKI STEEL CORPORATION, and TOYO KOHAN CO., LTD.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

MITTAL STEEL USA ISG INC.,

Defendant-Appellant.

_____

DECIDED: August 10, 2006
_____

Before MICHEL, Chief Judge, LINN and PROST, Circuit Judges.

MICHEL, Chief Judge.

The United States and Mittal Steel USA ISG Inc. ("Mittal") appeal the decision of the United States Court of International Trade ("trade court") instructing the United States International Trade Commission ("Commission") to issue a determination that the domestic industry was not materially injured by less-than-fair-value ("LTFV") imports of tin- and chromium-coated steel sheets ("TCCSS") from Japan. Nippon Steel Corp. v. United States, 350 F. Supp. 2d 1186, 1189, 1222 (Ct. Int'l Trade 2004) ("Nippon IV"). The Commission accordingly entered determinations of no material injury and no threat

of material injury. <u>Tin- and Chromium-Coated Steel Sheet from Japan (Views on Remand)</u>, USITC Pub. 3751, Inv. No. 731-TA-860 (Final) (Dec. 2004) (Third Remand Determination) ("<u>TRD</u>"). The Court of International Trade sustained the negative determinations. <u>Nippon Steel Corp. v. United States</u>, No. 00-09-00479 (Ct. Int'l Trade Mar. 23, 2005) ("<u>Nippon V</u>").

Appellants argue that the Court of International Trade erred in <u>Nippon IV</u> by reweighing the facts and substituting its own credibility determinations, in contravention of law and this court's remand instructions in <u>Nippon Steel Corp. v. Int'l Trade Comm'n</u>, 345 F.3d 1379, 1380 (Fed. Cir. 2003) ("<u>Nippon III</u>"). Appellants further argue that the Court of International Trade erred in holding in <u>Nippon IV</u> that the Commission's affirmative material injury determination in its second remand determination, <u>Tin- and Chromium-Coated Steel Sheet From Japan</u>, Inv. No. 731-TA-860 (Feb. 2004) (A.R.2-263R) (Second Remand Determination) ("<u>SRD</u>"), was supported by less than substantial evidence.

We agree. Accordingly, we reverse the Court of International Trade's decisions in <u>Nippon IV</u> and <u>Nippon V</u>, and instruct the trade court to vacate the Commission's negative material injury and negative threat of material injury determinations in <u>TRD</u> and reinstate the Commission's affirmative material injury determination in <u>SRD</u>.

**I**

This antidumping case has a procedural history spanning six years, which now includes four determinations by the Commission, four opinions from the Court of International Trade, and one prior opinion from this court. Given the voluminous record in this case, we presume familiarity with the prior proceedings, issues and factual

background. Accordingly, we provide only a cursory overview of the procedural history, and discuss only those factual and evidentiary issues that remain in dispute.

In 2000, the Commission made a final determination that the domestic industry was materially injured by TCCSS dumping from Japan, which required consideration of import volume, price effects, impact on domestic producers, and causation. Tin- and Chromium-Coated Steel Sheet From Japan, 65 Fed. Reg. 50,005, USITC Pub. 3300, Inv. No. 731-TA-860 (final determ.) (Aug. 2000) (A.R.2-148) ("Final Determination"). See 19 U.S.C. § 1677(7)(B)(i); Gerald Metals, Inc. v. United States, 27 F. Supp. 2d 1351, 1356 & n.8 (Ct. Int'l Trade 1998). Nippon Steel Corporation, NKK Corporation, Kawasaki Steel Corporation, and Toyo Kohan Co., Ltd. (collectively, "Nippon") sought review in the Court of International Trade, which sustained the Commission's finding of a small but significant volume, but remanded for a reevaluation of price effects and causation.[1] Nippon Steel Corp. v. United States, 182 F. Supp. 2d 1330, 1340, 1356 (Ct. Int'l Trade 2001) ("Nippon I").

On remand, the Commission again made an affirmative material injury determination. Tin- and Chromium-Coated Steel Sheet From Japan, Inv. No. 731-TA-860 (final determ.) (March 2002) (A.R.2-261R) (First Remand Determination) ("FRD"). Nippon again appealed, and the Court of International Trade found lingering flaws in the Commission's analysis of price effects and causation. Nippon Steel Corp. v. United States, 223 F. Supp. 2d 1349 (Ct. Int'l Trade 2002) ("Nippon II"). However, rather than remand for further proceedings, the court vacated the affirmative material injury determination and directed the Commission to enter a negative material injury

---

[1] Nippon did not appeal the Commission's finding of significant impact on domestic producers. See id. at 1335.

determination. Id. at 1372. The court declined to remand because, it stated, the Commission had "demonstrated an unwillingness or inability to address the substantial claims made by the respondents or the concerns expressed by the court in Nippon I." Id. at 1371-72.

The Commission then appealed to this court. We vacated the decision of the Court of International Trade in Nippon II and ordered a remand to the Commission for additional data gathering and analysis. Nippon III, 345 F.3d at 1380. We explained that "to the extent the Court of International Trade engaged in refinding the facts (e.g., by determining witness credibility), or interposing its own determinations on causation and material injury . . .[it] exceeded its authority", and held that the trade court abused its discretion by declining to remand the case to the Commission. Id. at 1381.

On the second remand, the Commission yet again made an affirmative material injury determination. SRD. Nippon sought review once more, and the Court of International Trade remanded for a third time, again instructing the Commission to enter a negative material injury determination. Nippon IV, 350 F. Supp. 2d. at 1189. In addition, the trade court directed the Commission to determine whether the domestic industry was threatened with material injury. Id. at 1222.

The Commission entered a negative material injury determination on the third remand, stating: "this outcome is dictated by the Court's findings in Nippon IV; it is not, however, the determination we would have made in the absence of those findings." TRD at 1. Similarly, the Commission found that certain statutory factors weighed in favor of an affirmative threat determination, but explained that the trade court's statement in Nippon IV that "the record fully supports a negative determination and will

not support an affirmative one", 350 F. Supp. 2d at 1222 (emphasis in original), "constrained significantly" its ability to perform a threat analysis and, in effect, required it to issue a ruling contrary to its factual findings. TRD at 5-6. As such, the Commission issued a negative threat of material injury determination. Id. The Commission expressed concern that the Court of International Trade had again exceeded the scope of its authority:

> Although we comply with the Court's order, we are concerned the Court has again exceeded the scope of its review authority in this case . . . [W]e believe that the trade court has committed the same mistakes identified by the Federal Circuit in Nippon III. For example, the Court has again re-found facts by substituting its view of the record for that of the Commission on such important issues as the significance of subject underselling or the existence of correlations between underselling and increased purchases of subject imports during the [period of investigation]. The Court has also rejected the Commission's witness credibility determinations, substituting in its place the Court's own assessment of the accuracy of testimony offered by purchasers during the investigation.
> Finally, by directing the Commission to issue a determination that subject imports did not cause material injury to the industry, the Court has again substituted its own findings on the ultimate issues of causation and injury for those of the Commission, even though the Federal Circuit specifically directed the Court in Nippon III not to do so.

Id. at 5.

Defendant-intervenor International Steel Group Inc. ("ISG")[2] sought review of the third remand determination in the Court of International Trade, arguing that the record supported an affirmative threat determination, and Nippon challenged certain subsidiary findings of the Commission's negative threat determination. Nippon V, slip op. at 3. The court sustained the negative material injury determination. Id., slip op. at 5. The court agreed with plaintiffs that two of the three appealed subsidiary rulings regarding

---

[2] During the course of these proceedings, ISG merged with Weirton, and was substituted as defendant-intervenor on November 24, 2004. Nippon V, slip op. at 4. ISG-Weirton merged with Mittal Steel USA effective April 2005.

threat of material injury—relating to production capacity, and volume and market penetration, see 19 U.S.C. § 1677(7)(F)(ii)—were flawed, but sustained as "reasonable" the Commission's ultimate negative determination of threat of material injury. Id., slip op. at 9, 14.

The United States and Mittal appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

Congress created a highly specialized system for resolving antidumping allegations, which recognizes and exploits each participant's area of expertise. An antidumping inquiry is divided into two sub-inquiries: a determination of whether the subject imports were, or were likely to be, sold at LTFV, and a material injury determination. Congress placed responsibility for the LTFV determination with industry experts at the Department of Commerce, 19 U.S.C. § 1673d(a)(1), and placed responsibility for the material injury determination with trade experts at the Commission. Id. § 1673d(b)(1).

Commissioners are appointed by the President, and confirmed by the Senate, because of their expertise in recognizing, and distinguishing between, fair and unfair trade practices. They presumably are selected to be Commissioners based on their expertise in, inter alia, foreign relations, trade negotiations, and economics. Because of this expertise, Commissioners are the factfinders in the material injury determination: "It is the Commission's task to evaluate the evidence it collects during its investigation. Certain decisions, such as the weight to be assigned a particular piece of evidence, lie

at the core of that evaluative process." <u>U.S. Steel Group v. United States</u>, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

In contrast, Article III judges have expertise primarily in law. Accordingly, Congress assigned the Court of International Trade, and, through our appellate authority, this court, the responsibility to review the legal sufficiency of a Commission determination. When the Commission has made a final determination of material injury or threat of material injury to a domestic industry, 19 U.S.C. § 1516a(b)(1)(B)(i) provides that the Court of International Trade "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." To be sure, judges of the Court of International Trade are experts in such cases, which form most of their docket, while this court's judges are characterized as generalists, as trade cases comprise only about six percent of the Federal Circuit docket.

Congress did not specify a standard of review for this court in reviewing judgments of the Court of International Trade. In <u>Atlantic Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984), however, we adopted the "substantial evidence" judicial review standard prescribed at § 1516a(b)(1)(B)(i) for the trade court as our appellate standard of review.[3] Because the substantial evidence standard requires review of the entire administrative record, we consider both the trade court's

---

[3] Appellees ask this panel to overrule the <u>Atlantic Sugar</u> standard of appellate review in favor of the more deferential "misapprehended or grossly misapplied" standard that the Supreme Court has adopted for itself in its discretionary review of agency actions via <u>certiorari</u> petitions. <u>See</u> <u>Universal Camera v. NLRB</u>, 340 U.S. 474, 491 (1951). Our panel, of course, does not have authority to entertain this argument, as only the court <u>en banc</u> may overrule precedent. <u>George E. Warren Corp. v. United States</u>, 341 F.3d 1348, 1351-52 (Fed. Cir. 2003).

prior decisions and the Commission determinations, see Am. Silicon Techs. v. United States, 334 F.3d 1033, 1037 (Fed. Cir. 2003), including "the evidence presented to and the analysis by the Commission", Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 932 (Fed. Cir. 1984). In undertaking this review, we give great weight to "the informed opinion of the Court of International Trade." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994). Indeed, it is nearly always the starting point of our analysis.

### III

In Nippon III, we expressly declined to decide whether the evidence supporting the Commission's affirmative material injury determination was substantial, stating that "[i]f and when the case reaches us again there will be time enough to do so." 345 F.3d at 1380. The case has reached us again, and we must now examine the substantiality of the evidence.

### A

"Substantial evidence" is difficult to define precisely. However, the Supreme Court, Congress, and prior panels of this court have provided some guidance. In NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939), the Court explained that "[s]ubstantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." A reviewing court must consider the record as a whole, including that which "fairly detracts from its weight", to determine whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477-78 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). As Judge

Nies explained in her additional views in <u>SSIH Equipment SA v. United States ITC</u>, 718 F.3d 365, 381 (Fed. Cir. 1983), in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean "is [the determination] unreasonable?"

In the legislative history of the APA, which adopted the "substantial evidence" standard of judicial review for certain agency decisions, <u>see</u> 5 U.S.C. § 706(2)(E), the Senate Judiciary Committee report recognized the difficulty of precise definition:

> As a matter of language, substantial evidence would seem to be an adequate expression of law. The difficulty comes about in the practice of agencies to rely upon (and of courts to tacitly approve) something less – to rely upon suspicion, surmise, implications, or plainly incredible evidence. It will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law.

S. Rep. No. 752, 79th Cong., 1st Sess. 28, 30-31, quoted in <u>Universal Camera</u>, 340 U.S. at 484 n.17. Accordingly, the Court in <u>Universal Camera</u> instructed that, under the substantial evidence standard, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." 340 U.S. at 467-68.

A party challenging the Commission's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." <u>Mitsubishi Heavy Indus., Ltd. v. United States</u>, 275 F.3d 1056, 1060 (Fed. Cir. 2001). We have explained that "even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." <u>Am. Silicon Techs. v. United States</u>, 261

F.3d 1371, 1376 (Fed. Cir. 2001). Accordingly, the question for the Court of International Trade was, and for this court is, "not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance." U.S. Steel, 96 F.3d at 1357. Rather, "we must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (internal quotation marks omitted). In short, we do not make the determination; we merely vet the determination.

## B

In a material injury inquiry, the Commission is required by statute to evaluate the volume, price effects, and impact of the subject imports. 19 U.S.C. § 1677(7). When the Commission makes an affirmative material injury determination, it must decide whether the material injury to the domestic industry is "by reason of" the subject imports. 19 U.S.C. § 1673d(b)(1).

The Commission engaged in substantial research and analysis prior to issuing its initial affirmative material injury determination. It created, distributed, and analyzed responses to detailed questionnaires sent to all seven domestic TCCSS producers, as well as the five largest domestic purchasers of TCCSS. From producers, the Commission obtained and analyzed information on production, geographic scope of sales, pricing and discounting practices, capacity utilization, shipments, inventories, and employment. From purchasers, the Commission obtained and analyzed information on final bids of domestic and Japanese suppliers, negotiation tactics, and purchasing

volume, and attempted to verify producers' lost sale allegations. Two Commission staff members visited complainant Weirton Steel's premises and interviewed several employees regarding the TCCSS manufacturing process, negotiations, pricing, and contracts. In addition, Commissioners heard a full day of testimony, including that of officers of four domestic purchasers, the CEO of Weirton Steel, and seven members of Congress, including Senator John D. Rockefeller IV.

The Court of International Trade likewise engaged in careful, thoughtful review of each of the Commission's findings. In <u>Nippon I</u>, the Court of International Trade sustained the Commission's finding of a small but significant volume. 182 F. Supp. 2d at 1340. The Commission also found significant impact, which Nippon did not appeal. <u>See</u> <u>id.</u> at 1335. Thus, as of <u>Nippon IV</u>, the Court of International Trade had already approved Commission findings on two of the three factors to be considered in a material injury determination. The evidence rejected by the Court of International Trade in <u>Nippon IV</u> related to the remaining factor, price effects, and to causation. We therefore state the issue before us as whether the Commission's findings that Japanese TCCSS dumping could be linked to price effects in, and causation of injury to, the domestic market so distorts or detracts from the evidence in favor of injury as to render the evidence supporting the Commission's ultimate affirmative material injury determination insubstantial on the record.

**1**

Section 1677(7)(C)(ii) provides that in evaluating price effects, the Commission shall consider whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

The trade court clearly was warranted in concluding that one finding of the Commission was unsupported by substantial evidence. However, we agree with the appellants that, with respect to other Commission findings, the record contained "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477-78 (quoting Consol. Edison, 305 U.S. at 229).

The Court of International Trade rejected the Commission's price effects evidence because, it stated, Japanese underselling and domestic price depression or suppression was "insignificant over the period of investigation" and "certain conditions of competition also minimized any effect subject imports could have had on domestic prices." Nippon IV, 350 F. Supp. 2d at 1221. In particular, the trade court cited a low to moderate ability of the imported TCCSS to impact domestic sales and prices; compartmentalized and segmented price negotiations with domestic and foreign producers, largely due to superior domestic lead times; the fact that domestic producers supplied the majority of product; and Weirton's inability to produce documentary evidence of Japanese price competition. Id.

On the one hand, the trade court correctly rejected evidence of price effects that contained a mathematical miscalculation. In an earlier determination, the Commission had provided disaggregated data on Purchaser A's facilities and product types, FRD at 10; in response to remand instructions, Nippon II, 223 F. Supp. 2d at 1355, the Commission aggregated Purchaser A's data. SRD at 24. Post-aggregation, however,

the calculations were inconsistent. The number of underselling bids decreased, while the volumes associated with underselling bids—and the total underselling bid volume—increased. Nippon IV, 350 F. Supp. 2d at 1191. The Court of International Trade correctly pointed out that aggregation should not affect the total bid volume and, after noting that the Commission had provided no explanation for the change in the total volume, correctly disregarded the evidence. Id. However, because the Court of International Trade approved the other two Commission findings relating to compilation of price comparison data, id. at 1192, even setting aside the flawed calculation, the trade court largely accepted the Commission's methodology.

On the other hand, we cannot support the Court of International Trade's rejection of the Commission's analysis of certain domestic producer accounting data, and thus its conclusion regarding domestic price suppression. The trade court rejected the Commission's finding that the subject imports caused the suppression of domestic prices, which was based on the Commission's underlying finding that the domestic industry was suffering from a cost-price squeeze.[4] The Commission evaluated the producers' financial data, noting that the domestic industry's overall cost of goods sold ("COGS") had increased in relation to net sales, from 96.4 percent of sales in 1997 to 97.8 percent in 1998 and 101.3 percent in 1999. SRD at 26. The Commission attributed this change to a corresponding decline in unit prices "at a rate that outstripped the industry's unit costs" and noted that the industry's profitability levels also declined consistently during the relevant period, with operating losses increasing from 0.9

---

[4] When cost of goods sold ("COGS") exceeds price, the producer is unable to sell the product for more than what it costs to produce the product; if the producer is unable to raise prices, the industry finds itself in what is referred to as a cost-price squeeze. See Nippon IV, 350 F. Supp. 2d at 1198.

percent in 1997 to 3.0 percent in 1998 to 6.5 percent in 1999. Id. The Commission acknowledged that the operating losses decreased to 1.9 percent in the interim year 2000, but attributed this change to the filing of the antidumping petition in October 1999. Id. at 26-27. Likewise, the Commission considered and rejected Nippon's assertion that "members of the domestic industry were able to increase their prices during the period in the face of subject import underselling for certain purchasers", stating that the record data indicates that "any such price increases were not sufficient to offset any corresponding changes in the industry's [COGS]." Id. at 27.

The Court of International Trade agreed that "the domestic industry generally may have been experiencing a cost-price squeeze", but rejected the Commission's conclusion based on Nippon's assertion that the two domestic producers competing most directly with Japanese TCCSS importers reported positive operating margins during the period of investigation. Nippon IV, 350 F. Supp. 2d at 1198 & n.27. Implicit in Nippon's assertion, and the Commission's rejection thereof, is the fact that other domestic producers showed negative operating margins. Thus, we are faced with a situation where some domestic producers, and the industry as a whole, were in a cost-price squeeze, while two major producers were not. Substantial evidence exists on both sides of the issue. The Commission opted for one inference, and the Court of International Trade for another. In such a situation, however, the statutory substantial evidence standard compels deference to the Commission.

Likewise, we cannot uphold two of the trade court's rejections of Commission findings regarding conditions of competition in the domestic industry. First, the trade court rejected the Commission's finding that U.S. and Japanese negotiations take place

on equal footing. In Nippon II, the Court of International Trade instructed the Commission to "evaluate purchaser perceptions with respect to the domestic industry's lead-time advantage as a potential explanation for keeping negotiations on separate tracks with volume allocated among domestic versus foreign suppliers." Nippon II, 223 F. Supp. 2d at 1352. In its SRD, the Commission found that domestic producers' lead time advantage was offset by purchasers engaging in negotiations far in advance of production needs and by Japanese producers' willingness to carry the cost of consignment inventories at storage facilities in the United States. SRD at 75-77. In support, the Commission cited purchaser testimony indicating that purchasers mitigated risks by giving a "finite number of specifications" to an offshore source, and two purchasers' internal memoranda discussing consignment, one of which stated that the purchaser was "working through to insure consignment inventories would be in place in an effort to mitigate problems [with on-time delivery from foreign sources]." Id. at 76-77. The Commission noted that the internal memoranda were consistent with a third purchaser's testimony regarding consignment. Id. at 77.

The Court of International Trade stated that "[t]he fact that purchasers negotiate for advance specifications and for consignment inventories with Japanese suppliers but not with domestic suppliers, undercuts the Commission's finding that U.S. and Japanese negotiations take place on equal footing." Nippon IV, 350 F. Supp. 2d at 1211-12. We do not agree that the Commission's finding was unreasonable in light of the evidence as a whole. In any purchasing situation, competing producers are not identical. As the Commission explained in its SRD, "each supplier, regardless of whether it is foreign or domestic, negotiates to maximize premiums based on its unique

05-1404, -1417                                   15

capabilities." SRD at 77. Purchasers attempt to negotiate concessions that will minimize each producer's drawbacks, and undertake a cost-benefit analysis in making the optimal purchasing decisions. This individualized assessment of producers may not mean that foreign and domestic producers do not compete for the same piece of business, and may indicate merely that purchasers cannot evaluate foreign and domestic producers in an identical way. The Commission's finding of equal footing was thus plausible given the evidence in the record as a whole.

Second, the trade court substituted its own inference regarding the significance of Weirton's inability to provide contemporaneous documentary evidence of Japanese price competition. The Weirton representative submitted documentation from the period of investigation that only contained pricing data from other domestic firms. See Nippon IV, 350 F. Supp. 2d at 1212. He testified that he only discovered "after the fact" that Weirton was competing with Japanese prices, and thus was not informed by customers that a particular quoted price was from a Japanese producer. Id. at 1212 n.62. In its FRD, the Commission accorded the absence of contemporaneous documentation little weight, FRD at 22-23, and reevaluated this finding after the Court of International Trade criticized its decision in Nippon II. Nippon II, 223 F. Supp. 2d at 1352.

On remand, the Commission again concluded that the absence of contemporaneous documentation deserved little weight. SRD at 78-80. The Commission stated that "the record reflects that purchasers do not specify the identity of suppliers with which they are negotiating, making it more difficult for a supplier to pinpoint its competition." Id. at 78. In support, it cited testimony from Weirton's CEO, who stated that the company never knows when specific Japanese bids are being

introduced into contract negotiations, and a sworn affidavit from a Weirton sales manager indicating that several purchasers informed him in negotiations of their intent to purchase low-priced product from Japan. Id. at 78-79. The Commission noted that the sales manager's testimony was corroborated by the purchasers' own documents, and was supported by another domestic producer's questionnaire response. SRD at 79-80. As such, the Commission concluded that "the fact that this information is contained in an affidavit of a [Weirton official] rather than in contemporaneous documents submitted by [Weirton] is not significant given that a purchaser's own contemporaneous documents effectively corroborate the affidavit." Id.

The trade court rejected the Commission's inference-drawing, stating that "the fact that Weirton—a party to this action and principal supporter of the petition—is unable to provide evidence supporting its allegations, is important evidence of lack of injury." Nippon IV, 350 F. Supp. 2d at 1212-13. The trade court expressed skepticism over Weirton's failure to document offshore competition, and failure to document Japanese competition after the fact. Id. Again, we do not agree that the Commission's finding was unreasonable in light of the evidence as a whole. The Weirton representative's testimony was consistent and was not impeached, and was corroborated by testimony of its sales manager and by documents from the purchaser involved in the negotiations. The assessment of the proper weight to accord to testimony is within the role of the Commission, not this court and not the Court of International Trade. Perhaps Senior Judge Nichols best explained this principle in his additional views in Matsushita. The appellants in Matsushita challenged a Commission determination of threat of material

injury which, like the appellants' challenge here, rested largely on the weight given to testimony of an allegedly injured domestic producer. Senior Judge Nichols wrote:

> There may not be a word of truth in any of his testimony, but we are required to supposed otherwise, since it was given in person and under oath and subject to cross-examination, since his knowledge of the subject was obviously unsurpassed, and since no opposing testimony was introduced, as it easily could have been if Mr. Moss' testimony were false or if his opinions were erroneous. The Moss testimony is just the kind a court must look for when it is required to review a determination under the "substantial evidence" standard. One who seeks to overturn a quasi-legislative determination, reviewed under that standard, without such testimony in support of his own position is undertaking a heavy load indeed.

Matsushita, 750 F.2d at 937. Here, the record as a whole contained substantial evidence supporting Weirton's assertions, which the mere absence of contemporaneous documentation, without more, cannot nullify. Accordingly, the trade court erred in rejecting the Commission's conclusion regarding the conditions of competition in the domestic industry.

**2**

Section 1673d(b)(1) provides that, once the Commission has made an affirmative material injury determination, it must determine whether the injury arises "by reason of imports, or sales (or the likelihood of sales) for importation . . . . If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated." This causation requirement is met so long as the effects of dumping are not merely incidental, tangential, or trivial. Gerald Metals, Inc. v. United States, 132 F.3d 716, 721-22 (Fed. Cir. 1997).

In rejecting the Commission's finding on causation, we must conclude that the Court of International Trade again improperly substituted its own credibility

determinations for those of the Commission. The Commission's finding of causation was based entirely on its interpretation of purchaser questionnaires, testimony, and purchasing history. For example, Purchaser F stated in its questionnaire that it dropped two domestic suppliers because of price, and two for poor performance. See Nippon IV, 350 F. Supp. 2d at 1215. The Purchaser F representative testified that, after "a series of delivery and quality disappointments with certain U.S. mills", specifically Weirton, it made "a strategic decision to diversify its sourcing including additional sourcing [of TCCSS] from abroad" during the period of investigation. Id.

In its FRD, the Commission noted that Purchaser F's testimony that it dropped Weirton due to delivery and quality disappointments could not be reconciled with Purchaser F's increased TCCSS purchases from Weirton in 1999, Purchaser F's questionnaire response indicating that two domestic suppliers had been dropped because of price, or internal documents indicating that its sourcing decisions were driven primarily by price. FRD at 33. The Commission concluded that the evidence that import purchases were made because of price was more credible, and found that injury to the domestic industry was not caused solely by problems with domestic producers' quality and delivery. Id.

In Nippon II, the trade court rejected the Commission's explanation by stating that Purchaser F's increased purchases from Weirton in 1999 was not necessarily inconsistent with its citation of delivery and quality issues, because Purchaser F was also experiencing delivery and quality issues with another domestic supplier in 1999. Nippon II, 223 F. Supp. 2d at 1367. In its SRD, the Commission considered the trade court's comments, but reaffirmed its conclusion that Purchaser F's testimony was

inconsistent with, and less credible than, other data of record pointing to price concerns. SRD at 95. The Commission emphasized that the purchaser questionnaire was executed and signed by the testifying representative, and thus the "unambiguous" testimony and questionnaire responses, which offered opposing reasons for dropping domestic suppliers, were unquestionably contradictory. Id. at 97-98. In addition, the Commission again pointed out that Purchaser F's purchasing patterns during the relevant period were inconsistent with its testimony, and thus supported the Commission's decision to discount the testimony. Id. at 98.

The Court of International Trade again rejected the Commission's findings. It restated its position that Purchaser F's testimony and questionnaire responses were consistent, this time emphasizing that the questionnaire also listed quality as one of the reasons leading to its switch to foreign producers. Nippon IV, 350 F. Supp. 2d at 1215. The court expressly declined to readdress the Commission's assertion that Purchaser F's documented purchasing patterns were inconsistent with its testimony, id. at 1215 n.66, and held that, when considering all of the evidence, it was clear that "the harm suffered by the domestic industry was not by reason of subject imports." Id. at 1222.

We need not decide whether Purchaser F's testimony can be reconciled with its questionnaire response and documented purchasing history, because the record contains substantial evidence pointing to both price and quality as reasons for Purchaser F's switch to a foreign producer. It may well be that the trade court's analysis of the evidence relating to Purchaser F was correct, but the basis of that decision rested upon a determination that Purchaser F's testimony was entitled to more weight than the Commission gave it. Under the substantial evidence standard, when adequate

evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission.

## C

The Court of International Trade engaged in an extremely thorough, careful examination of the record. Indeed, we can accept that the Court of International Trade may well have conducted a better analysis than did the Commission, and that we would have reached the same conclusion as the trade court if deciding the case in the first instance. However, even with the most generous interpretation of the Court of International Trade's conclusions, we cannot agree that the evidence before the Commission with respect to price effects and causation fell short of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera, 340 U.S. at 477-78 (quoting Consol. Edison, 305 U.S. at 229).

As explained supra, a party challenging the Commission's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." Mitsubishi, 275 F.3d at 1060. "[E]ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001). Here, it is significant that the trade court already had accepted the Commission's findings on the first two factors supporting its affirmative material injury determination: volume and impact. It is dispositive, however, that ample evidence existed on both sides of the remaining factor, price effects, and on the question of causation. Evidence of an industry cost-price squeeze—as a whole and thus necessarily for some producers

individually—may or may not outweigh the existence of positive operating margins for the two domestic producers competing most directly with Japan. The existence of inconsistencies between a purchaser's questionnaire responses and testimony means that this record contained potentially credible evidence on both sides of the issue. Likewise, the existence of factors suggesting that domestic and Japanese negotiations do, or do not, take place on equal footing, and the question of whether to discount Weirton's unimpeached testimony for lack of contemporaneous documentation, relate to credibility and the proper weight of evidence; the resolution of these questions must be left to the expert factfinder.

The Court of International Trade's rejection of the Commission's error in calculation is permissible, indeed required, under the substantial evidence standard of review, which intends that a reviewing court correct exactly this type of obvious error. However, when the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder—here the majority of the Presidentially-appointed, Senate-approved Commissioners—to decide which side's evidence to believe. So long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission.

**IV**

The United States also argues that the Court of International Trade acted <u>ultra vires</u> in directing the Commission to enter a negative material injury determination, and asserts that § 1516a does not permit the court to reverse a determination of the Commission, directly or indirectly. We have stated in dicta that "[s]ection 1516a limits

the Court of International Trade to affirmances and remand orders; an outright reversal without a remand does not appear to be contemplated by the statute." Altx, 370 F.3d at 1111 n.2. However, we implied the opposite in Atlantic Sugar, also in dicta, where we said that if the evidence supporting a material injury determination is "insubstantial, then the reviewing court must either reverse the [Commission]'s determination or remand the case for further fact-finding." 744 F.2d at 1561. Because, here, substantial evidence supports the Commission's original affirmative material injury determination, we need not and do not decide the scope of Court of International Trade authority to reverse under § 1516a. It may well be that, in another situation, the trade court may be faced with a Commission determination that is unsupported by substantial evidence, and for which a remand would be "futile." Nippon IV, 350 F. Supp. 2d at 1222. We hold only that this is not the case today.

## V

For the reasons articulated above, we hold that the Court of International Trade erred in assessing credibility and in reweighing the evidence before the Commission, and erred in concluding that the Commission's finding of material injury to the domestic injury was not supported by substantial evidence. Accordingly, we reverse the Court of International Trade's decisions in Nippon IV and Nippon V, set aside the Commission's negative material injury and negative threat of material injury determinations in TRD, and direct that the trade court reinstate the Commission's affirmative material injury determination in SRD.

<u>REVERSED.</u>

05-1404, -1417                                    23