Slip Op. 14 - 59

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | |
| Plaintiff, | |
| v. | Before: Donald C. Pogue, Chief Judge |
| UNITED STATES, | |
| Defendant, | Court No. 12-00314[1] |
| and | |
| MINH PHU SEAFOOD CORP., et al., | |
| Defendant-Intervenors. | |

OPINION

[affirming final results of administrative review of antidumping duty order]

Dated: May 29, 2014

Andrew W. Kentz, Jordan C. Kahn, and Nathaniel Maandig Rickard, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Mykhaylo Gryzlov, Senior

---

[1] This action was previously consolidated with Nha Trang Seaproduct Co. v. United States, Ct. No. 12-00317, and Minh Phu Seafood Corp. v. United States, Ct. No. 12-00310, see Order Nov. 26, 2012, ECF No. 23, but the latter two actions were subsequently dismissed, see ECF No. 28.

Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Matthew R. Nicely and Alexandra B. Hess, Hughes Hubbard & Reed LLP, of Washington, DC, for the Defendant-Intervenors.

**Pogue, Chief Judge:** This action arises from the sixth administrative review of the antidumping duty order covering certain frozen warmwater shrimp (the "subject merchandise") from the Socialist Republic of Vietnam ("Vietnam").[2] Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC")[3] challenges the final results of this review, claiming that the United States Department of Commerce ("Commerce") made unreasonable determinations when calculating the home market or "normal" comparison values that the agency used to determine whether and to what extent the subject merchandise was dumped in the U.S. market during the relevant time period.[4] Specifically, AHSTAC

---

[2] See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 77 Fed. Reg. 55,800 (Dep't Commerce Sept. 11, 2012) (final results and final partial rescission of antidumping duty administrative review) ("Final Results"), as amended by 77 Fed. Reg. 64,102 (Dep't Commerce Oct. 18, 2012) (amended final results and partial final rescission of antidumping duty administrative review) and accompanying Issues & Decision Mem., A-552-802, ARP 10-11 (Sept. 4, 2012) ("I & D Mem.").

[3] AHSTAC is an association of manufacturers, producers, and wholesalers of a domestic like product in the United States that participated in this review. Compl., ECF No. 2, at ¶ 7.

[4] See Mot. of [AHSTAC] for J. on the Agency R. Under USCIT Rule 56.2, Ct. No. 12-00310, ECF No. 35 ("AHSTAC's Br.").

contends that 1) Commerce unreasonably based its valuation of respondents' factors of production on surrogate market-economy data from Bangladesh, rather than the Philippines[5]; and 2) Commerce unreasonably valued the relevant labor wage rates using data from a single surrogate market economy.

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[6] and 28 U.S.C. § 1581(c) (2006).

As explained below, because Commerce's well-reasoned selection of Bangladesh as an appropriate market economy surrogate for Vietnam was supported by a reasonable reading of the record evidence, Commerce's reliance on data from Bangladesh to construct normal values in this review is affirmed. Additionally, because Commerce reasonably applied its lawful new policy when calculating surrogate labor rates in this proceeding, Commerce's labor rate valuation is also affirmed.

---

[5] Because Commerce treats Vietnam as a non-market economy country, the agency determines the home market or normal value of merchandise from Vietnam by using surrogate market economy data to calculate production costs and profit. See *infra* Section I.A of this opinion.

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

**STANDARD OF REVIEW**

The court will sustain Commerce's antidumping determinations if they are supported by substantial evidence and otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (defining "substantial evidence")), and the substantial evidence standard of review can be roughly translated to mean "is the determination unreasonable?" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation and alteration marks and citation omitted).

**DISCUSSION**

I.  Surrogate Country Selection

First, AHSTAC claims that Commerce's determination to estimate respondents' market-value cost of producing the subject merchandise by relying on data from Bangladesh, rather than the Philippines, is unreasonable. AHSTAC's Br. at 9, 13-18.

*A. Background*

Because Commerce treats Vietnam as a non-market economy ("NME") country, the agency determines the normal value

of merchandise from Vietnam by using surrogate market economy data to calculate production costs and profit. See 19 U.S.C. § 1677b(c)(1). In doing so, Commerce's valuation of the factors of production ("FOPs") must be "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the [agency]." Id. "[T]o the extent possible," Commerce is required to use data from countries that are both economically comparable to the NME and significant producers of comparable merchandise. Id. at § 1677b(c)(4).

When choosing appropriate surrogate market economy countries, Commerce first creates a list of potential surrogates whose per capita gross national income ("GNI") falls within a range of comparability to the GNI of the NME country (the "potential surrogates list").[7] Next, Commerce identifies which countries on the potential surrogates list produce merchandise comparable to the merchandise subject to the antidumping duty

---

[7] See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited Apr. 30, 2014) ("Policy 4.1"). See also Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1075-76, 638 F. Supp. 2d 1325, 1347-49 (2009) (discussing Commerce's practice for creating the potential surrogates list and noting that "[a]lthough Commerce places primary emphasis on GNI when compiling its list of potential surrogate countries, it apparently does not set a fixed range into which a potential surrogate's per capita GNI must fall") (citation omitted).

order.[8]  After that, the agency determines "whether any of the
countries which produce comparable merchandise are 'significant'
producers of that comparable merchandise."[9]  Finally, "if more
than one country has survived the selection process to this
point, the country with the best [FOP] data is selected as the
primary surrogate country."[10]

        Because Commerce's policy is to treat all of the
countries that were initially placed on the potential surrogates
list as "equivalent in terms of economic comparability [to the
NME country]," regardless of their relative GNI proximity
thereto,[11] a literal application of <u>Policy 4.1</u> implies that
Commerce will choose from among the potential surrogates that
satisfy its selection criteria (i.e., economic comparability,
significant production of comparable merchandise, and data
availability) based solely on considerations of relative data

---

[8] <u>Policy 4.1</u>.  Commerce's policy provides detailed examples of
the agency's process for determining whether merchandise that is
not identical to the subject merchandise is nevertheless
"comparable." <u>See</u> <u>id.</u>

[9] <u>Id.</u> (referring to 19 U.S.C. § 1677b(c)(4)).

[10] <u>Id.</u> (referring to 19 U.S.C. § 1677b(c)(1)).

[11] <u>Policy 4.1</u> (noting that this practice "reflects in large part
the fact that the statute does not require [Commerce] to use a
surrogate country that is at a level of economic development
*most* comparable to the NME country") (emphasis in original).

quality.[12]  This means that even very slight differences in data

quality between the potential surrogates may become dispositive

and automatically outweigh comparatively large differences among

the candidates in terms of their economic comparability to the

NME country and the magnitude of their production of comparable

merchandise.[13]

          In prior opinions, this Court has remanded Commerce's

_____

[12] See Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 882 F. Supp. 2d 1366, 1374 (2012) ("China Shrimp
AR5") (discussing "Commerce's policy of disregarding relative
GNI differences among potential surrogates for whom quality data
is available and who are significant producers of comparable
merchandise").

[13] In China Shrimp AR5, for example, both India and Thailand
satisfied all of the selection criteria to serve as potential
surrogate market economies for the People's Republic of China
("China"), which Commerce also treats as an NME country.
Although Thailand's GNI was nearly identical to China's, whereas
India's GNI was just over a third of China's, and although
Thailand was arguably a more significant producer of comparable
merchandise than India, Commerce selected India as the primary
surrogate country based on a very slight difference between the
relevant Indian and Thai FOP data.  Specifically, although the
Indian and Thai data were so similar in quality that Commerce
was unable to make a distinction between the two datasets based
on the agency's usual data-evaluation standards, Commerce found
that the Indian data for shrimp larvae (the critical input for
producing the subject merchandise) did not specify the species
of shrimp to which they referred, whereas the Thai data for
shrimp larvae were specific to a species of shrimp that the
mandatory respondent in that proceeding did not produce.  On the
basis of this distinction – i.e., based essentially on a finding
that a subset of the Indian data was more vague than its
counterpart within the Thai data – Commerce selected India as
the primary surrogate country for China. See China Shrimp AR5,
__ CIT at __, 882 F. Supp. 2d at 1372, 1375-76.

surrogate country selections where the agency applies Policy 4.1 in a way that arbitrarily discounts the value of relative GNI proximity (i.e., relative economic comparability) to the NME country when choosing among potential surrogates for whom quality data is available and who are significant producers of comparable merchandise. See China Shrimp AR5, __ CIT at __, 882 F. Supp. 2d at 1374-76; Amanda Foods (Vietnam) Ltd. v. United States, 33 CIT 1407, 1413, 647 F. Supp. 2d 1368, 1376 (2009) ("Vietnam Shrimp AR2").

   *B. Analysis*

        Here, AHSTAC challenges Commerce's selection of Bangladesh as the primary surrogate market economy country for Vietnam in this review. AHSTAC's Br. at 13-18.  Specifically, AHSTAC contends that Commerce erred by applying Policy 4.1 in such a way that "the GNI differential between Vietnam and the potential surrogate countries was completely excluded from consideration when Commerce selected Bangladesh [in this review]." Id. at 16.  Accordingly, AHSTAC argues that Commerce's surrogate country selection should be remanded on the same grounds as those supporting remand in China Shrimp AR5 and Vietnam Shrimp AR2. Id. at 16-18.

        But AHSTAC mischaracterizes the record in this case. Commerce has not "completely excluded from consideration" the

potential surrogates' relative GNI proximity to the GNI of

Vietnam when selecting the primary surrogate country from the

potential surrogates list.  On the contrary, Commerce explicitly

acknowledged that "India's [GNI[14]] is closer to that of Vietnam"

than "the relatively less similar [GNI] of the Philippines and

Bangladesh." I & D Mem. cmt. 1 at 4.[15]  Commerce then determined

that, on the record of this review, the accuracy-enhancing value

of Bangladesh's significantly superior FOP data quality

outweighed the accuracy-enhancing value of India's relative GNI

proximity. See id. at 5.[16]

---

[14] Although the Issues & Decision Memorandum refers to the
potential surrogates' gross domestic product ("GDP") rather than
their GNI, Commerce in fact generates the potential surrogates
list using GNI figures, rather than GDP. See Antidumping
Methodologies in Proceedings Involving Non-Market Economy
Countries: Surrogate Country Selection and Separate Rates,
72 Fed. Reg. 13,246, 13,246 n.2 (Dep't Commerce Mar. 21, 2007)
(noting that Commerce uses GNI, rather than GDP, to construct
the potential surrogates list because "while the two measures
are very similar, per capita GNI is reported across almost all
countries by an authoritative source (the World Bank), and
because [Commerce] believes that the per capita GNI represents
the single best measure of a country's level of total income and
thus level of economic development").

[15] Commerce determined that the Philippines, India, and
Bangladesh were each within the range of economic comparability
to Vietnam, and were each significant producers and exporters of
products comparable to the subject merchandise during the
relevant time period. I & D Mem. cmt. 1 at 4.

[16] Because Commerce in fact addressed "the GNI differential
between Vietnam and the potential surrogate countries," AHSTAC's
Br. at 16, in making its primary surrogate country selection,
declining to reach the merits of AHSTAC's contention that
(footnote continued)

Specifically, Commerce determined that the available Philippine data on shrimp (the FOP accounting for the largest portion of normal value) omitted "substantial portions of the range of sizes of shrimp sold by the respondents," while the available Indian data on shrimp was 1) limited to a sole company within India, and thus did not "represent the broad market average [that Commerce] prefers," and 2) provided values that were publicly ranged, and thus values that did not "represent actual, exact prices for shrimp in the Indian market." I & D Mem. cmt. 1 at 5.  The available Bangladeshi data, on the other hand, represented a broad-market average, were product-specific, contemporaneous with the POR, and represented actual transaction prices. Id.  Accordingly, Commerce determined that, notwithstanding Bangladesh's lesser GNI proximity to Vietnam

---

Commerce improperly failed to do so would not be appropriate in this case. Cf. Def.'s Corrected Resp. in Opp'n to Pl.'s Mot. for J. Upon the Agency R., ECF No. 41 ("Def.'s Br.") at 20-23 (arguing that the court should decline to reach the merits of AHSTAC's contention in this regard because AHSTAC failed to make this argument before the agency in the first instance); 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, *where appropriate*, require the exhaustion of administrative remedies.") (emphasis added); Blue Field (Sichuan) Food Indus. Co. v. United States, __ CIT __, 949 F. Supp. 2d 1311, 1321 (2013) ("This court has discretion to determine when it will require the exhaustion of administrative remedies.") (citing 28 U.S.C. § 2637(d)); Itochu Bldg. Prods. v. United States, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (holding that requiring exhaustion of administrative remedies is appropriate where doing so "can protect administrative agency authority and promote judicial efficiency") (citation omitted).

than that of the other two potential surrogates, "the

superiority of the Bangladeshi surrogate value data compared to

the Philippine and Indian surrogate value data" outweighed the

benefits of using data from a country with a relatively closer

GNI to that of Vietnam.[17] See id. at 4-5.

Thus Commerce specifically weighed the relative GNI

proximity of each potential surrogate to Vietnam's GNI against

the significant differences in the quality of the relevant

surrogate value data available from each of these countries.

_____

[17] Importantly, Bangladesh's *relatively* less similar GNI to that
of Vietnam (when compared with India's GNI) does not affect
Commerce's determination that all three potential surrogate
countries independently fell within the range of economic
comparability to Vietnam, and therefore that data from all three
countries would satisfy that threshold statutory requirement.
See I & D Mem. cmt. 1 at 4.  The appropriateness of placing
Bangladesh on the initial potential surrogates list (based on
Commerce's finding that Bangladesh's GNI fell within the range
of economic comparability to Vietnam) is uncontested.
Accordingly, Fujian Lianfu – which addressed a challenge to the
appropriateness of placing India on the potential surrogates
list for China, and was therefore not concerned with the
*relative* economic comparability of potential surrogates, but
rather with whether India should have been considered a
potential surrogate at all, 33 CIT at 1075, 638 F. Supp. 2d
at 1347 – is inapposite to the case at hand.  Cf. Def.'s Br.
at 13 (relying on Fujian Lianfu to argue that "Commerce applied
the standard that this Court affirmed in Fujian").  It may well
be that, in placing Bangladesh on the potential surrogates list
for Vietnam, Commerce applied the standard that the court
affirmed in Fujian Lianfu, but Commerce's initial placement of
Bangladesh on the potential surrogates list is not the issue
before the court.  Here, the challenge is to Commerce's
consideration of the merits of each of the potential surrogates
on that list relative to each other, which is an issue that was
not before the court in Fujian Lianfu.

See I & D Mem. cmt.1 at 4-5.  Accordingly, contrary to AHSTAC's

contentions, Commerce did in fact consider the differences in

GNI among the potential surrogates.  For this reason, the

grounds supporting the remand orders in China Shrimp AR5 and

Vietnam Shrimp AR2 are not present in this case.[18]

Moreover, Commerce's explanation for why the agency

chose to give more weight to the superiority of the Bangladeshi

surrogate value data than to India's relatively closer GNI is

reasonable.[19]  Specifically, Commerce explained that, although

India's GNI was closer to that of Vietnam's – implying a more

accurate estimate for the FOP values that tend to be linearly

---

[18] Cf. China Shrimp AR5, __ CIT __, 882 F. Supp. 2d at 1375
(explaining that, in that case, "Commerce did not decide that
the superiority of Indian data quality outweighed the
superiority of Thailand's economic comparability to the NME,"
but rather "Commerce decided that it need not consider relative
economic comparability, or weigh one country's strength in
economic comparability against another's strength in data
quality") (citation omitted); Vietnam Shrimp AR2, 33 CIT
at 1413, 647 F. Supp. 2d at 1376 (explaining that, in that case,
Commerce did not consider or explain "why the difference in
economic similarity to Vietnam [among the potential surrogates]
is outweighed by the differences in quality of data between
Bangladesh and India").

[19] Notably, although AHSTAC argues that Commerce should have
selected the Philippines rather than Bangladesh, see AHSTAC Br.
at 9, the Philippines' GNI is actually less similar to that of
Vietnam than is Bangladesh's. See id. at 7 (quoting record
evidence listing the per capita GNIs for Vietnam, Bangladesh,
and the Philippines as $1,010, $590, and $1,790, respectively;
and thus showing that the GNI differential between Vietnam and
Bangladesh ($1,010 - $590 = $420) is in fact nearly half that
between Vietnam and the Philippines ($1,010 - $1,790 = -$780)).

correlated with GNI, such as wage rates[20] – the available Indian

surrogate value data for shrimp (the FOP accounting for the

largest portion of normal value) was limited to only a single

company and did not reflect exact market prices, whereas the

available Bangladeshi data represented a broad market average

based on actual transaction prices. I & D Mem. cmt. 1 at 5.[21]

        Accordingly, because Commerce's selection of

Bangladesh as the primary surrogate country for Vietnam in this

review was supported by a reasoned and reasonable analysis of

the record, this determination is sustained as supported by

substantial evidence. See Nippon Steel, 458 F.3d at 1351.

## II. Labor Wage Rate Valuation

        AHSTAC also argues that the Final Results should be

remanded for additional consideration because they "are devoid

of any effort to address Commerce's prior labor findings, let

alone explain why those findings are no longer persuasive."

------

[20] See *infra* Section II of this opinion.

[21] Again, these facts distinguish this case from China Shrimp AR5 and Vietnam Shrimp AR2, where Commerce did not consider the potential surrogates' relative GNI proximity to the NME country at all. See *supra* note 18.  Moreover, in China Shrimp AR5, unlike here, the differences in data quality between the potential surrogates were too minor to reasonably support a conclusion that data superiority outweighed any potential benefits from using data from a surrogate with a GNI that was closer to that of the NME in question. See China Shrimp AR5, __ CIT __, 882 F. Supp. 2d at 1375-76.

AHSTAC Br. at 25 (citation omitted).  Specifically, AHSTAC

faults Commerce for deciding to value the labor FOP in the same

way that the agency values all other surrogate FOPs (i.e., by

relying on data from a single surrogate country, unless reliable

data for a particular FOP are not available from the primary

surrogate), without explaining its departure from its prior

position that "labor is different." Id. (internal quotation

marks and citation omitted).

### A. Background

        In the past, Commerce generally valued the labor FOP

for merchandise from NME countries by using "regression-based

wage rates reflective of the observed relationship between wages

and national income in market economy countries." 19 C.F.R.

§ 351.408(c)(3) (2010).  Regression-based NME wage rates

estimated the linear relationship between GNI and wage rates to

arrive at the wage for an NME country by using the NME's GNI.[22]

---

[22] Zhejiang DunAn Hetian Metal Co. v. United States, __ CIT __,
707 F. Supp. 2d 1355, 1366 (2010) (footnote omitted), vacated on
other grounds, 652 F.3d 1333 (Fed. Cir. 2011); see also Dorbest
Ltd. v. United States, 604 F.3d 1363, 1371 (Fed. Cir. 2010)
("Commerce determines a linear trend that best fits the data,
providing a way to predict the labor rate for a country with any
given gross national income."); Antidumping Duties;
Countervailing Duties, 61 Fed. Reg. 7308, 7345 (Dep't Commerce
Feb. 27, 1996) ("[W]hile per capita [gross domestic product] and
wages are positively correlated, there is great variation in the
wage rates of the market economy countries that [Commerce]
typically treats as being economically comparable. As a
                                          (footnote continued)

During the fourth administrative review of this antidumping duty order, however, 19 C.F.R. § 351.408(c)(3) was invalidated as contrary to the statute because, rather than evaluating the extent to which it was possible to base surrogate FOP calculations on data from countries that are economically comparable to the NME and significant producers of comparable merchandise,[23] the regulation instead formulaically required reliance on data from countries that did not satisfy one or both of these statutory requirements.[24]

---

practical matter, this means that the result of an NME case can vary widely depending on which of the economically comparable countries is selected as the surrogate.  . . .  [U]se of [regression-based] wage rate[s] will contribute to both the fairness and the predictability of NME proceedings. By avoiding the variability in results depending on which economically comparable country happens to be selected as the surrogate, the results are much fairer to all parties.").

[23] See 19 U.S.C. § 1677b(c)(4).

[24] See Dorbest, 604 F.3d 1371-72 (holding that because the statute requires Commerce to use data from economically comparable countries "to the extent possible," Commerce may not employ a methodology that requires using data from both economically comparable and economically dissimilar countries, in the absence of a showing "that using the data Congress has directed Commerce to use is impossible"); Shandong Rongxin Imp. & Exp. Co. v. United States, __ CIT __, 774 F. Supp. 2d 1307, 1316 (2011) (holding that because the statute requires Commerce to use, "to the extent possible," data from countries that are "significant" producers of comparable merchandise, Commerce may not employ a methodology that requires using data from "countries which almost certainly have no domestic production – at least not any meaningful production, capable of having influence or effect").

Subsequently, before the results of the fifth review of this antidumping duty order were finalized but after Commerce had already made its preliminary surrogate country selection for that review, Commerce published its New Labor Rate Policy, explaining its change in policy for constructing surrogate labor rates.[25]  Specifically, the New Labor Rate Policy rejected Commerce's prior preference for using data from multiple market economies to construct surrogate labor rates in favor of a policy of relying on data from a single market economy to calculate all surrogate FOPs, including labor. Id. at 36,094. Because the results of the fifth review had not yet been finalized at the time that the New Labor Rate Policy went into effect, Commerce applied its new policy in that review, as it has in all subsequent antidumping proceedings involving merchandise from NME countries.

In adjudicating AHSTAC's challenge to Commerce's application of its New Labor Rate Policy in the fifth review of this antidumping duty order, this Court sustained the New Labor Rate Policy as reasonable on its face, holding that "Commerce reasonably determined that, in general, the administrative costs

_____

[25] Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (Dep't Commerce, June 21, 2011) ("New Labor Rate Policy").

of engaging in a complex and lengthy analysis of additional surrogate data for the labor FOP may outweigh the accuracy-enhancing benefits of doing so."[26]  But because Commerce had initially selected the primary surrogate country in that segment of this antidumping proceeding before the New Labor Rate Policy went into effect, when Commerce's policy was still to use multiple countries' data to calculate surrogate labor rates, Commerce's initial surrogate country analysis did not consider the reasonableness of its selection in terms of providing the best available information regarding the surrogate values for *all* FOPs, including labor.  And because Commerce did not reevaluate the appropriateness of its surrogate country selection for valuing all of the FOPs, including labor, when applying its New Labor Rate Policy in finalizing the results of that review, Commerce's surrogate country selection was remanded for the agency to explicitly weigh the evidence that its chosen surrogate's wage data were likely to understate the surrogate market labor rate for the shrimping industry in Vietnam (given the particular GNI disparity between the surrogate and the NME country and the linear relationship between GNI and wage)

---

[26] Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 968 F. Supp. 2d 1328, 1336 (2014) ("Vietnam Shrimp AR5") (citing Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 880 F. Supp. 2d 1348, 1358 (2012)).

against the remaining evidence that the chosen surrogate's FOP data as a whole were nevertheless the best available data on record from which to value all of the surrogate FOPs.[27]

*B. Analysis*

Here, unlike Vietnam Shrimp AR5, Commerce specifically weighed the considerations that the court ultimately ordered Commerce to weigh in the remand of that prior review. See I & D Mem. cmt. 1 at 4-5. Commerce explained that, although India's GNI was closer to that of Vietnam's – implying a more accurate estimate for the FOP values that tend to be very closely correlated with GNI, such as wage rates[28] – the available Indian surrogate value data for the FOP accounting for the largest portion of normal value were so inferior to the available Bangladeshi data that any accuracy-enhancing benefit accruing from selecting India – the country with the closest GNI to Vietnam's – was in fact outweighed by the accuracy-loss of inferior data quality. See id.[29] Thus, as already discussed,[30]

---

[27] Id. at 1336-37.

[28] See *supra* note 22.

[29] As discussed above, Commerce found that the Indian data was limited to only a single company and did not reflect exact market prices, whereas the available Bangladeshi data represented a broad market average based on actual transaction prices. I & D Mem. cmt. 1 at 5.

[30] See *supra* Section I of this opinion.

Commerce's primary surrogate country analysis in this review reasonably accounted for the effect of the specific GNI differential between Bangladesh and Vietnam (i.e., the likely underestimation of the surrogate labor rate) by explaining that any accuracy-loss from an underestimated wage rate is outweighed by the accuracy gained from using Bangladeshi data for the remaining FOPs. See I & D Mem. cmt. 1 at 4-5.

AHSTAC does not point to any specific record evidence to suggest that Commerce's analysis resulted in an unreasonable choice of surrogate FOP data as a whole – i.e., AHSTAC has not pointed to any evidence that Commerce has not already considered and weighed when making its primary surrogate country selection and implementing its new policy of sourcing all FOP data from that primary surrogate.[31]  And while AHSTAC is correct that, notwithstanding the New Labor Rate Policy, Commerce may not rely on data that are aberrational or distortive,[32] AHSTAC's argument

---

[31] Indeed, as already noted above, the GNI differential between Vietnam and the Philippines (AHSTAC's preferred surrogate) is *greater* than that between Vietnam and Bangladesh. See *supra* note 17. Cf. Vietnam Shrimp AR5, __ CIT at __, 968 F. Supp. 2d at 1336-37 (suggesting that a logical implication of Commerce's New Labor Rate Policy is that considerations of the labor-valuation accuracy-enhancing benefits of a potential surrogate's GNI proximity to the GNI of the NME country must now be weighed as part of Commerce's primary surrogate country selection analysis).

[32] The New Labor Rate Policy itself explicitly acknowledges this. See New Labor Rate Policy, 76 Fed. Reg. at 36,094 ("If there is
                                                          (footnote continued)

that the Bangladeshi wage data used in this review were aberrational is not persuasive. As Commerce explained, see I & D Mem. cmt. 2C at 12, although the Banglandeshi labor data exhibit values lower than other countries on Commerce's initial potential surrogates list, this does not mean that the numbers are aberrational. Rather, just as Bangladesh's GNI is the lowest within the range of GNI values exhibited by the countries on the potential surrogates list (all of which were determined to satisfy the threshold economic comparability requirement, a determination that is not contested), so too Bangladesh's labor data is merely the lowest value within the range of economically comparable countries on that list. See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, __ CIT __, 929 F. Supp. 2d 1352, 1356 n.9 (2013) (rejecting a similar argument made by AHSTAC in a challenge to the final results of the fifth review of this antidumping duty order).

Thus AHSTAC's challenge to Commerce's reliance on its New Labor Rate Policy to value all relevant FOPs in this review

---

evidence submitted on the record by interested parties demonstrating that the NME respondent's cost of labor is overstated, the Department will make the appropriate adjustments to the surrogate financial statements subject to the available information on the record."); I & D Mem. cmt. 2C at 13 (noting that Commerce will look to data beyond that from the primary surrogate country "when a suitable [FOP] value from the primary surrogate country does not exist on the record").

(including the labor rate) using data from the primary surrogate country must be rejected because Commerce's <u>New Labor Rate Policy</u> is generally reasonable, and no evidence suggests that it was unreasonably applied on the record of this review.

## CONCLUSION

For all of the foregoing reasons, Commerce's <u>Final Results</u> are sustained.  Judgment will issue accordingly.


                                    ___/s/ Donald C. Pogue_____
                                    Donald C. Pogue, Chief Judge

Dated: May 29, 2014
       New York, NY