**Slip Op. 06-131**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Judge Judith M. Barzilay**

| | |
|---|---|
| CLEO INC, CRYSTAL CREATIVE PRODUCTS, INC., and TARGET CORPORATION, | : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| UNITED STATES, | : |
| Defendant, | : <br> : |
| and | : <br> : |
| SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC., | : <br> : <br> : |
| Defendant-Intervenor. | : <br> : <br> : |

**Consol. Court No. 05-00336**
**Public Version**

[Plaintiffs' Motions for Judgment on Agency Record denied.]

Decided: August 31, 2006

Blank Rome, LLP (*Frederick L. Ikenson*), *Larry Hampel*, and *Roberta K. Daghir*, for Plaintiffs Cleo Inc, and Crystal Creative Products, Inc.

Mayer, Brown, Rowe & Maw, LLP (*Marguerite E. Trossevin*), *Kristy L. Balsanek*, and *James J. Jochum*, for Plaintiff Target Corporation.

*Michael D. Panzera*, U.S. Department of Justice, Commercial Litigation Branch, Civil Division; (*Mark B. Rees*, *Neal J. Reynolds*, and *James M. Lyons*), U.S. International Trade Commission, Office of the General Counsel, for Defendant.

Collier, Shannon, Scott, PLLC (*Adam H. Gordon* and *Kathleen W. Cannon*), for Defendant-Intervenor.

**OPINION**

**BARZILAY, JUDGE:**          This action is before the court on Plaintiffs' motions for judgment on the agency record pursuant to USCIT Rule 56.2.  The parties contest a final material injury determination issued by an evenly divided United States International Trade Commission ("ITC" or "Commission"), which found an industry in the United States materially injured by reason of imports of certain tissue paper products from the People's Republic of China ("China") already determined by the Department of Commerce ("Commerce") to have been sold at less than fair value ("LTFV") in the United States.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).  For the reasons set forth below, the court upholds the ITC's determination.

**BACKGROUND**

This case arises from an ITC investigation instituted on February 17, 2004, by petitioners Seaman Paper Company of Massachusetts, Inc. ("Seaman" or "Defendant-Intervenor"), American Crepe Corporation ("American Crepe"), Eagle Tissue LLC ("Eagle Tissue"), Flower City Tissue Mills Co. ("Flower City"), Garlock Printing & Converting, Inc. ("Garlock Printing"), Paper Service, Ltd., Putney Paper Co., Ltd., and the Paper, Allied-Industrial, Chemical and Energy Workers International Union AFL-CIO, CLC.  *See Certain Tissue Paper Products and Crepe Paper Products from China*, 69 Fed. Reg. 8232-01 (Feb. 23, 2004) (initiation notice (prelim.)).  The petitioners alleged that domestic industries producing tissue paper and crepe paper were materially injured by reason of dumped imports of tissue paper and crepe paper from China.  P.D. 1.[1]

---

[1] Citations to documents contained in the public administrative record are designated as "P.D.," followed by the document number assigned by the ITC.  Citations to documents

In April 2004, the ITC made an affirmative material injury determination in the preliminary phase of its injury investigation. *Certain Tissue Paper Products and Crepe Paper Products From China*, 69 Fed. Reg. 20,037 (Apr. 15, 2004), P.D. 62A. It found that there were two domestic like products – tissue paper and crepe paper – and performed separate injury analyses for the industries producing these products. *See Certain Tissue Paper Products and Crepe Paper Products from China*, Inv. No. 731-TA-1070 (Preliminary), USITC Pub. 3682 (Apr. 2004), P.D. 70. After the ITC made its preliminary injury determinations, Commerce issued final affirmative LTFV determinations for crepe paper and tissue paper from China on December 3, 2004 and February 14, 2005, respectively. *Notice of Final Determination of Sales at LTFV and Affirmative Final Determination of Critical Circumstances: Certain Crepe Paper from the People's Republic of China*, 69 Fed. Reg. 70,233-01 (Dec. 3, 2004); *Notice of Final Determination of Sales at LTFV: Certain Tissue Paper Products from the People's Republic of China*, 70 Fed. Reg. 7475 (Feb. 14, 2005). The Commission then issued its final determination based on a three-to-three split vote. *See Certain Tissue Paper Products from China*, 70 Fed. Reg. 15,350 (Mar. 25, 2005), P.D. 307. The views of the Commission are published in *Certain Tissue Paper Products from China*, Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005) (hereinafter "Final Results"), P.D. 308. The period of investigation ("POI") was July 1, 2003, through December 31, 2003. *See Notice of Final Determination of Sales at LTFV: Certain Tissue Paper Products from the People's Republic of China*, 70 Fed. Reg. at 7476.

---

contained in the business proprietary, confidential administrative record are designated "C.D.," followed by the document number assigned by the Commission. Confidential versions of the ITC's tissue paper views appear at C.D. 518 (majority "Confidential Views") and 519 ("Dissenting Views").

Plaintiffs Cleo Inc ("Cleo"), its wholly owned subsidiary Crystal Creative Products, Inc. ("Crystal"), (collectively "Cleo/Crystal") – domestic producers of tissue paper – and Target Corporation ("Target"), a domestic purchaser of tissue paper, challenge the ITC's tissue paper determination. They appeal the ITC's 1) finding that bulk and consumer tissue paper constitute a single domestic like product; 2) attribution of the increase in Target's imports of consumer tissue paper to dumping despite Target's special requirements for consumer tissue; 3) decision to attribute to dumping the increase in Cleo/Crystal's consumer tissue imports; and 4) analysis of the data on injury and impact.

## STANDARD OF REVIEW

The Court will uphold a determination by the Commission unless it is not supported by substantial evidence in the administrative record or is otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). The ITC's determination is "presumed to be correct," and the burden of proving otherwise rests upon the parties challenging the determination. 28 U.S.C. § 2639(a)(1).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotations and citations omitted). "'[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n.*, 383 U.S. 607, 619-20 (1966)); *see Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). That Plaintiffs seeking a review

> can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is not the function of a court to decide that, were it the Commission, it would have made the same decision on the basis of the evidence.

*Matsushita*, 750 F.2d at 936. Thus, under the substantial evidence standard, the Court may not, "even as to matters not requiring expertise . . . displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp.*, 340 U.S. at 488; *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996). In sum, the Court "may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 28 CIT __, __, 342 F. Supp. 2d 1267, 1272 (2004).

### DISCUSSION

Commerce and the ITC have distinct functions in antidumping proceedings. Upon receipt of a petition, Commerce determines the scope of investigation by "determin[ing] that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value." 19 U.S.C. § 1673(i); *see* §§ 1673a, 1673d. If Commerce finds that subject merchandise is being sold at LTFV, the ITC then must determine whether a U.S. industry is being injured, threatened with injury, or materially retarded by reason of imports of that merchandise. §§ 1673, 1673a, 1673b. First, the ITC determines the scope of the "domestic industry" by defining the "domestic like product" under investigation. *See* 19 U.S.C. § 1677(4)(A). The Commission then makes either negative or affirmative injury determination. *See* 1673d(b). "[O]nly where [Commerce's] and the ITC's determinations are both affirmative," can Commerce issue an

antidumping order.[2] *Badger-Powhatan v. United States*, 9 CIT 213, 216, 608 F. Supp. 653, 656 (1985).

### A.    The ITC's Finding of a Single Like Product

To determine whether an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise, the Commission first defines the "industry"[3] and the "domestic like product."[4] *See* 19 U.S.C. § 1673(1)-(2). "The Commission's decision regarding the appropriate domestic like product is a factual determination, where the Commission applies the statutory standard of 'like' or 'most similar in characteristics and uses' on a case-by-case basis." *NEC Corp. v. Dep't of Commerce*, 22 CIT 1108, 1110, 36 F. Supp. 2d 380, 383 (1998) (citing *Torrington Co. v. United States*, 14 CIT 648, 652 n.3, 747 F. Supp. 744, 749 n.3 (1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 634, 638 n.5, 693 F. Supp. 1165, 1169 n.5 (1988)). "Although the Commission must accept the determination of Commerce as to the scope of the imported merchandise sold at less than fair value, the Commission

---

[2] For the purposes of § 1673, subject merchandise refers to "that merchandise upon which both affirmative LTFV sales and material injury determinations have been made." *Badger-Powhatan*, 608 F. Supp. at 656.

[3] "The term 'industry' means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A).

[4] "'[D]omestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10).

determines what domestic product is like the imported articles Commerce has identified." *Id.*

(citing *Makita Corp. v. United States*, 21 CIT 734, 748, 974 F. Supp. 770, 783 (1997)).

Consequently, "Commerce's designation of the class or kind of merchandise sold at LTFV does

not control the Commission's definition of the industry injured in its sales of like products."

*Hosiden Corp. v. Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1568 (Fed. Cir. 1996).

In identifying a single like product, the ITC "disregards minor differences, and looks for

clear dividing lines between like products." *Nippon Steel Corp. v. United States*, 19 CIT 450,

455 (1995) (not reported in F. Supp.). The ITC has employed the following factors in its "like

product" analysis: (1) physical appearance, (2) interchangeability, (3) channels of distribution, (4)

customer perceptions, (5) common manufacturing facilities and production employees, and

where appropriate, (6) price. *See NEC Corp.*, 22 CIT at 1110. These factors are by no means

exhaustive.[5]

Target claims that the Commission's analysis in this case rested on the notion that there is

a legal presumption that the domestic like product is coextensive with the scope of the imports

under investigation and was therefore legally flawed. Target S.J. Mem. 10-11. Cleo/Crystal, on

---

[5] Legislative history demonstrates that when Congress tasked the ITC with making injury determinations in antidumping cases, it gave the ITC significant leeway in deciding what constitutes "like products:"

> The ITC will examine an industry producing the product like the imported article being investigated . . . . The requirement that a product be 'like' the imported article should not be interpreted in such a narrow fashion as to permit *minor differences in physical characteristics or uses* to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation.

S. Rep. No. 96-249 at 90-91 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 476-77 (emphasis added).

the other hand, argues that the Commission imposed a stringent overlap requirement – "one that tolerates far less 'overlap' in the factors when looking for clear dividing lines between the two like products." Cleo Reply 3. Plaintiffs have not demonstrated how the ITC's analysis is distorted by these supposed presumptions. The ITC expressly refuted that it employed the presumption that the like product definition must be coextensive with the scope of Commerce's LTFV investigation. Def's S.J. Mem. 18-19; *see Acciai Speciali Terni S.p.A. v. United Staes*, 24 CIT 1064, 1065 n.3, 118 F. Supp. 2d 1298, 1300 n.3 (2000) (stating that it is ITC's task to determine "what domestic product or products is like the imported articles Commerce identified.") Plaintiffs also claim that the ITC's finding was not supported by substantial evidence and was not in accordance with law with respect to the six factors that the ITC employed to determine that bulk tissue paper and consumer tissue paper constitute a single like product.[6] As discussed below, the court's review of the administrative record leads it to conclude that the ITC's finding of a single like product was supported by substantial evidence and in accordance with law.

### 1. Physical Appearance

According to the ITC, the

> [s]ubject tissue paper products are produced from rolls of flat tissue paper (*i.e.*, jumbo rolls) and are cut to length sheets that are either white, colored, decorated, or customized in a variety of ways. They are sold either flat or folded and are typically used by businesses as a wrap to protect customer purchases or by

---

[6] Plaintiffs argue that the split among the Commissioners supports their position. This Court has held that "[s]uch a split in the evidence, however, is not fatal to the ITC's determination. It is well-established that there may be substantial evidence on an administrative record to support two inconsistent determinations." *Siderca, S.A.I.C. v. United States*, 29 CIT __, __, 374 F. Supp. 2d 1285, 1298 (2005) (citing *Consolo*, 383 U.S. at 620).

consumers to wrap objects, often in conjunction with gift bags. Key performance characteristics include appearance, strength, and durability.

Final Results at 3. The ITC established that "bulk tissue" is "sold in bulk to independent retailers, department stores, specialty stores, catalog stores, cosmetic companies and manufacturers, which typically use the tissue paper in their own businesses, often to wrap customer purchases." Final Results at 6. "'Consumer tissue' is sold packaged to various retailers (*e.g.*, mass merchants, warehouse discount clubs, specialty stores, party supply stores, drug stores, and grocery stores) for retail sale." Final Results at 6.

The Commission found that bulk and consumer tissue paper share the same general physical characteristics and uses. This position is solidly supported by the following evidence in the record: 1) Both forms of tissue paper are made from flat tissue and consist of lightweight paper with a gauze-like, fairly transparent character, Final Results at 6; Confidential Staff Report at I-5; 2) Consumer and bulk tissue paper come in a variety of grades, colors, designs, dimensions, quantities, and packaging, and both are sold primarily as white or solid color sheets, Confidential Staff Report at I-6-I-9; 3) Consumer and bulk tissue paper may be sold in printed form or undergo specialty treatment in small amounts, Final Results at 6-7; Confidential Staff Report at I-11-I-12, I-22 & Tables I-1-I-2; and 4) Consumer and bulk tissue paper are used for wrapping an item within a box, or bag or as lightweight gift wrap, Final Results at 7; Confidential Staff Report at I-6-I-7.

### 2. *Manufacturing Processes*

The Commission found a reasonable similarity with respect to the production processes

for bulk and consumer tissue paper.[7] *See* Confidential Views at 9; Confidential Staff Report at I-12-I-17, I-23-I-24 & App. D. Bulk and consumer tissue paper are both made from jumbo rolls of flat paper. Final Results at 6; *see* Tr., *In the Matter of Certain Tissue Paper Products and Crepe Paper Products from China*, Inv. No. 731 - TA - 1070 (Final) (Dec. 2004) at 17, P.D. 239 (hereinafter "Revised Tr.") (testimony of George D. Jones, III, President, Seaman). Producers making both forms of tissue paper reported that production takes place in the same facilities, using overlapping equipment and employees. For example, one producer reported [[    ]], and another reported [[    ]]. Confidential Staff Report at D-4. Bulk and consumer tissue paper are printed on the same presses. Confidential Staff Report at I-15-I-16, I-24 & App. D; Revised Tr. at 18-19, (Mr. Jones), 38-40 (Peter Garlock, President, Garlock Printing).

With respect to manufacturing facilities and processes, Plaintiffs claim that there is a dividing line between the two products, pointing out that nine of twelve of the U.S. producers make only one product. In addition, the two companies that produce both products demonstrate a [[    ]]. Target's S.J. Mem. 20. Notably, Plaintiffs point out that a small number of producers that manufacture both types of tissue paper often produce them on different production lines or with different equipment. Target's S.J. Mem. 20 (Final Results, App. 1, Tab. 1). Finally,

---

[7]But see the views of the dissenting Commissioners:
Of twelve producers, only four manufacture both bulk and consumer tissue, and only one of these manufactures significant quantities of both. The evidence indicates that for the minority of firms that manufacture both bulk and consumer tissue paper, both products are produced in the same facilities with common employees and similar processes. Nevertheless, consumer tissue paper requires either different production lines and/or specialized equipment for the distinct packaging. Moreover, at least one large purchaser requires a lengthy design phase for the production of consumer tissue paper.
Dissenting Views at 7; C.D. 519, App. 4.

Plaintiffs ask the court to consider the fact that Seaman [[     ]] Target's S.J. Mem. 21. Plaintiffs maintain that this agreement "belies" the government and Seaman's position that there is only one like product. Target's S.J. Mem. 21. Nonetheless, as the Commission ultimately found, these factors do not outweigh evidence in the record showing that most producers and importers considered bulk and consumer tissue to be the same or similar products. Confidential Staff Report at I-23-I-24 & App. D.

### 3. *Customer Perceptions and Interchangeability*

The government admits that the record was mixed regarding consumer perceptions and interchangeability. Indeed, the data is mixed. Seven U.S. producers generally found that bulk and consumer tissue paper were interchangeable, while five found them non-interchangeable. Confidential Staff Report at I-24-I-25 & D-3-D4. [[     ]] indicated that the only similarity between consumer and bulk tissue is the base tissue stock. That company pointed to differences between consumer and bulk tissue paper based on the packaging, labeling, artwork, and folding of paper within packages. Confidential Staff Report at I-24-I-25 & D-3-D4. Eight importers affirmatively denied that there is interchangeability and five stated or suggested that they consider bulk and tissue paper interchangeable. *See* Confidential Staff Report at D-10-D-11.

Further, the Purchaser questionnaire revealed a limited consumer overlap between bulk and consumer tissue paper. Confidential Staff Report D-6-D-7. Out of five purchasers of bulk and consumer tissue paper, two perceived the products purchased as interchangeable, and one distinguished the two merely by size. Confidential Staff Report at D-6-D-7. [[     ]] denied any comparability between the tissue types. Confidential Staff Report at D-7. There is also evidence that many purchasers bought only one form of tissue paper. *See* Confidential Staff Report at D-

6-D-7.  The data does not reveal a discernible pattern.  Because it is not the court's task to make

its own evaluation based on the evidence before it, but to find whether the agency's finding has

reasonable support in the record, the court will not upset the Commission's finding where

sufficient evidence buttresses the agency's conclusion.  *See, e.g.*, *NEC Corp.*, 22 CIT at 1111.

### 4.  *Channels of Distribution and Price*

In terms of distribution channels and price, the government concedes that there was only

a limited level of overlap between the two types of tissue paper.  Confidential Views at 8-9.  In

fact, consumer tissue paper was sold primarily to retailers in 2003 ([[    ]] percent of such

shipments), while most domestic bulk tissue paper sales in 2003 were made to distributors

([[    ]] percent of such shipments).  Confidential Staff Report at II-1 & Tables II-1-II-2.

Plaintiffs claim that the Commission erred in finding that there was even a limited overlap

between bulk and consumer tissue paper in terms of these distribution channels and price.  *See*

Cleo/Crystal S.J. Mem. 20; Target S.J. Mem. 27-28.  However, the record demonstrates some

overlap in the channels of distribution:  [[    ]] percent of bulk tissue paper sales were made to

retailers, the channel in which most consumer tissue paper was sold, while [[    ]] percent of

consumer tissue paper sales were made to distributors, the channel in which most bulk tissue

paper was sold.  Confidential Views at 8-9; Confidential Staff Report at Table II-2.

Plaintiff Cleo effectively argues that this weak overlap reveals flaws in the ITC's prior

position in *Folding Gift Boxes from China*, Inv. No. 731-TA-921 (Final), USITC Pub. 3480

(Dec. 2001): that an "overlap in terms of packaging quantities between [certain] . . . two

[products is] a significant factor contributing to the blurring of any distinction between bulk and

consumer tissue paper."  Cleo S.J. Mem. 21 (citing Confidential Views at 10 n.49).  Cleo argues

that examining the sheet-count overlap "*in the context with the products being packaged and the channel of distribution to which they are marked* discloses the overlap to be illusory." Cleo/Crystal S.J. Mem. 21. Specifically, Cleo explains that if bulk tissue paper is "overwhelmingly sold" by the ream (480 sheets) packaged in poly bags either as flat sheets or quire-folded sheets, and consumer tissue is usually packaged for sale as a retail item in smaller quantities of sheets (5 to 40 sheets), the overlap is minimal. However, as the ITC established, to the extent that there is an overlap,[8] the blurring in terms of packaging is not illusory, even in the context of different channels of distribution.

The ITC also found that the price of consumer tissue paper was generally higher than that of bulk tissue paper. Confidential Views at 9; Confidential Staff Report at I-19, I-26-I-27. On the other hand, as the Commission noted, the consumer tissue paper prices were more comparable to bulk with respect to larger packaging sizes, suggesting that sheet quantities per package played an important role in explaining price differences. Confidential Views at 9 & n.48; Confidential Staff Report at Table V-5; C.D. 440 at Ex. 4. Finding this overlap significant is a reasonable interpretation of the evidence. *See NEC Corp.*, 22 CIT at 1111.

Plaintiffs argue that the agency deviated from its prior practices, citing to several

_____

[8] The record shows that there are retail ready packages of seasonal consumer tissue folds with sheet counts between 90-120 sheets and "club packs" containing up to 400 sheets. Thus, while consumer tissue is often sold packaged in smaller quantities than bulk – in quantities ranging from 5 to 40 sheets – it is also often sold in seasonal packages and club packs containing from 90 to 400 (and even more) sheets, which are comparable in size to the packaging in which some bulk tissue paper is sold. Confidential Views at 7; Confidential Staff Report at I-9, I-22 & App. D; Amendment to Staff Report, C.D. 504 at I-10. Furthermore, although bulk tissue paper is usually sold in flat sheets, and consumer tissue paper in folded sheets, bulk tissue paper is also often sold in quire-folded sheets, while consumer tissue paper can be sold in unfolded flat sheet form. Confidential Views at 7; Confidential Staff Report at I-8-I-10.

decisions that involved analogous factual scenarios.  For instance, Plaintiffs refer to *Folding Gift Boxes from China*, where the ITC found that certain gift boxes sold to stores to give away to their customers and gift boxes sold to merchants for resale were separate like products.  Inv. No. 731-TA-921 (Final), USITC Pub. 3480 (Dec. 2001).  *See also Automotive Replacement Glass Windshields from China*, Inv. No. 731-TA-922 (Final), USITC Pub. 3494 (Mar. 2002); *Melamine Institutional Dinnerware from China, Indonesia, and Taiwan*, Inv. Nos. 731-TA-741-743 (Final), USITC Pub. 3016 (Feb. 1997).  Plaintiffs argue that in each case, the Commission correctly found a clear division between the markets for consumer or retail goods and similar industrial or non-consumer goods.  Drawing parallels between the present case and these prior decisions, Plaintiff asks the court to find the ITC's decision contrary to law because of its failure to adjudicate the case based on "the clear dividing line between the consumer and non-consumer products."  *See* Target's S. J. Mem. at 12.

While this argument is appealing at first, there are critical distinctions between the present case and these cases.[9]  In addition, when an agency departs from its prior decisions, it

---

[9]The Commission explicitly explains how it distinguished *Folding Gift Boxes from China* from this case:

> [T]he significant overlap in physical characteristics and uses, and in manufacturing facilities, processes, and employees evident on this record was lacking in *Folding Gift Boxes*.  Entire phases of production (*e.g.*, design and collating), involving different processes, facilities, and equipment, were unique to retail boxes as compared to give-away boxes . . . .

Final Results at 9 n.49.  Similarly, in *Melamine Institutional Dinnerware*, the Commission found that melamine institutional dinnerware and melamine retail ware were different like products based on the fact that 1) there were clear physical appearance and distribution differences between the two products, 2) producers and purchasers uniformly considered them different products, and 3) the parties agreed that they were different like products.  USITC Pub. 3016 at 10-13.

In rebutting Plaintiff's position, the government argues that the Commission's like product finding in this case resembles its findings in a number of previous determinations.  *See,*

must "'explain the reasons for its departure,'" *Hussey Cooper, Ltd. v. United States*, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) (quoting *Citrosuco Paulista*, 12 CIT at 1209), and here the ITC did so by explaining why it did not divide the markets for consumer or retail goods and similar industrial or non-consumer goods. *See* Final Results at 9 n.49; *see also Citrosuco Paulista*, 12 CIT at 1209 ("[T]he Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation.").

"In reviewing the Commission's like product findings under the substantial evidence test, it is not the province of the courts to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence." *NEC Corp.*, 22 CIT at 1111; *see Nippon Steel Corp. v. United States*, No. 05-1404, 05 -1417, 2006 WL 2290991, at *3 (Fed. Cir. Aug. 10, 2006) (quoting *U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996)) (Commissioners "presumably are selected to be Commissioners based on their expertise in, *inter alia*, foreign relations, trade negotiations, and economics. Because of this expertise, Commissioners are the fact finders in the material injury determination: 'It is the Commission's task to evaluate the evidence it collects during its investigation. Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process.'"). Thus, the court must afford deference to the Commission's decision to give a greater weight to

---

*e.g.*, *Certain Pasta from Italy and Turkey*, Inv. Nos. 701-TA-365-366 and 731-TA-734-735, USITC Pub. 2977 (July 1996) at 8-9 (rejecting argument that dry pasta packaged for sale to "the retail market" and dry pasta packaged in bulk for sale to industrial users were different like products, and noting that similarities in products' basic physical characteristics, end uses, and production processes outweighed differences between products with respect to their packaging, channels of distribution, price, and fact products had only limited degree of interchangeability).

the physical characteristics, end use, and production similarities between bulk and consumer

tissue paper as opposed to the differences in their distribution channels, pricing and

interchangeability, and to uphold the ITC's conclusion that bulk tissue paper and consumer tissue

paper constitute a single like product.

### B.      The Commission's Finding of Material Injury by Reason of Imports

"An affirmative injury determination requires both (1) present material injury and (2) a

finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v.*

*United States*, 132 F.3d 716, 719 (Fed. Cir. 1997) (citations omitted). The relevant statute

provides:

> The Commission shall make a final determination of whether –
>    (A) an industry in the United States –
>       (i) is materially injured, or
>       (ii) is threatened with material injury, or
>    (B) the establishment of an industry in the United States is materially
>    retarded,
> *by reason of imports*, or sales (or the likelihood of sales) for importation, of the
> merchandise with respect to which the administering authority has made an
> affirmative determination under subsection (a)(1) of this section. If the
> Commission determines that imports of the subject merchandise are negligible,
> the investigation shall be terminated.

19 U.S.C. § 1673d(b)(1) (emphasis added). "In general [t]he term 'material injury' means harm

which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). When

determining the causal connection between imports and material injury, the "ITC is required to

consider three factors . . . : 1) the volume of imports, 2) the effect of imports on prices of like

domestic products, and 3) the impact of imports on domestic producers of like products." *USX*

*Corp. V. United States*, 11 CIT. 82, 84, 655 F. Supp. 487, 490 (citing 19 U.S.C. § 1677(7)(B)

(1982)).  In addition, the ITC "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  19 U.S.C. § 1677(7)(B)(ii).

### 1. Import Volume Finding

"In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  The ITC found that the volume of subject imports had been significant during the period examined in absolute and relative terms.  It observed a sharp increase throughout the POI, rising from [[    ]] million square meters in 2001 to [[    ]] million square meters in 2002 and [[    ]] million square meters in 2003.  Thus, the absolute volume of subject imports increased approximately [[    ]] percent between 2001 and 2003, with the subject imports gaining [[    ]] percentage points of market share during this period.  Confidential Views at 23-24.  The ITC concluded that the "domestic market share [of the subject merchandise] declined by approximately the amount that subject import market share grew, from 91.0 percent in 2001 to 87.2 percent in 2002 and to 70.9 percent in 2003."  Final Results at 17 & Table IV-2.  Moreover, "[s]ubject import volume relative to production in the United States increased throughout the POI, rising from [[    ]] percent in 2001 to [[    ]] percent in 2002 and to [[    ]] percent in 2003."  Confidential Views at 24.

In its analysis, the Commission considered volume trends for bulk and consumer tissue paper.  As the Commission found, the subject imports of bulk tissue paper increased from [[    ]] square meters  to [[    ]] square meters between 2001 and 2003.  Confidential Views at 24-25.

The subject imports of consumer tissue paper increased from [[    ]] square meters to [[    ]] square meters between 2001 and 2003.  Confidential Views at 25.   Further, between 2001 and 2003, Target's imports of consumer tissue paper increased by [[    ]] square meters, and Cleo/Crystal's imports of consumer tissue paper [[    ]] square meters.  Thus, Target and Cleo/Crystal accounted for [[    ]] percent of the total increase in subject import volume during the POI.  C.D. 498 (Importer Comparison Data Run Sheet); *see* Confidential Staff Report at IV-4 ("[[    ]] accounted for [[    ]] of subject tissue paper imports from China in 2003.").  Importantly, the Importer Comparison Data Run Sheet indicates that Target's share of growth of the consumer tissue paper imports between 2002 and 2003 was approximately [[    ]] percent, and Cleo/Crystal's share about [[    ]] percent.  C.D. 498; *see also* Hr'g Tr. 21.

Plaintiffs urge the court to focus on the underlying reasons for increased imports rather than the mere volume of imports.  *See* Target S.J. Mem. 31; Cleo/Crystal S.J. Mem. 30-31.  They claim that they accounted for the vast majority of the consumer tissue paper imports in 2003 and that their imports were non-injurious because they were not by reason of dumped merchandise.  *See* Target S.J. Mem. 31; Cleo/Crystal S.J. Mem. 29-32.  Thus, they maintain that the Commission failed to establish the requisite causal nexus between subject imports and the injury to domestic industry required under 19 U.S.C. § 1673d(b).

a. Target's Imports

Target claims that its imports of consumer tissue paper were non-injurious because they "did not displace domestic production."  Target S.J. Mem. 31.  Citing to several prior cases where the Commission found that imports serving new or expanding markets without displacing domestic production did not have a significant adverse effect, Target claims that it opened and

expanded a new market for specialty consumer tissue paper. Target S.J. Mem. 31 (citing, *e.g.*, *Fresh Cut Roses from Colombia and Ecuador*, Invs. Nos. 731-TA-684-685 (Final), USITC Pub. 2862 at 42 (Mar. 1995) (finding that "imports were sold into important new markets and did not significantly displace domestic fresh cut roses in their existing markets")). Since 2001, Target has seen significant growth in a new market for consumer tissue paper "driven by consumers' growing preference for gift bags, [sic] and Target's innovative concept that introduced fully coordinated, mix-and-match color programs." Target S.J. Mem. 32-33 (citing Admin. Tr. at 202-11, P.R. 239). Target explains that consumer tissue paper became part of a coordinated line of gift-wrapping products unique to the company. Target S.J. Mem. 32-33.

Target contends that domestic companies did not have the capacity for the kind of design, color, and quality that Target required. Target S.J. Mem. 34. It explained that domestic producers could not provide it with the specialized collated presentations and packaging that it needs. *See* Revised Tr. at 211-12. Finally, Target maintains that prior to 2004, no domestic industry actually attempted to meet its needs. In 2004, [[    ]] offered to supply Target with consumer tissue paper; however, Target found that [[    ]] did not maintain a design team, which itself would disqualify the company from two of Target's programs. Decl. Deborah Kelley, ¶ ¶ 7-8, Target's Post-Hr'g Br., Att. A (Jan. 12, 2005), C.D. 441 ("For [one of Target's programs], [[    ]] would have to develop design capabilities."). Target claims that the Commission unfairly focused on one transaction between [[    ]] and Target to conclude that Target was purchasing domestic consumer tissue. *See* Final Results at 23. Target's Senior Buyer also affirmed that to her knowledge, "none of the petitioners in this investigation have qualified as vendors to Target for" two of its product programs. Decl. Deborah Kelley, ¶ 2, Target's Post-Hr'g Br., Att. A, C.D.

441.  Finally, Target maintains that the Commission also incorrectly considered Target's purchases of *bulk* tissue from certain domestic sources, which it considers "entirely irrelevant to the issue of whether the U.S. industry can meet Target's special requirement for *consumer* tissue."  Target S.J. Mem. 35 & n.92 (citing Confidential Views at 34).

The Commission considered Target's claim that it only purchased growing amounts of subject consumer tissue paper imports because the domestic industry was unwilling or unable to meets its demands.  It focused on bulk and consumer tissue paper and concluded that the record demonstrated that Target's tissue paper needs could be met by domestic suppliers.  Thus, one domestic producer was [[     ]].  Seaman's Post-Hr'g Br., Ex. 1, Answers to Commission's Questions at 27, C.D. 441; *see also* Confidential Views 33-34.  In addition, one domestic supplier reported that [[     ]].  *See* Confidential Staff Report at V-19.  Furthermore, although Target claims that it could not source certain specialty paper from the domestic industry, the ITC concluded that "[s]ales of specialty tissue in relation to the overall U.S. market for tissue paper appear small, and the record shows that the domestic industry competes for such sales."  Confidential Views at 23; Confidential Staff Report at I-11 & Table I-2.  Specifically, in 2003, specialty tissue constituted [[     ]] percent of the domestic industry's U.S. shipments of consumer tissue paper, and [[     ]] percent of importers' U.S. shipments of consumer tissue paper.  Confidential Staff Report at I-11.  Overall, therefore, the Commission reasonably concluded that Target could not argue that the domestic companies were unwilling to supply Target with tissue paper.[10]

---

[10]Further supporting its position, the Commission explains that "there is no consensus within the industry as to what constitutes 'specialty' tissue paper."  Confidential Staff Report at I-11.  The Commission cites to several sources buttressing this observation.  Confidential Staff

The court "'must affirm a Commission determination if it is *reasonable* and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.' In short, we do not make the determination; we merely vet the determination." *Nippon Steel Corp.*, 2006 WL 2290991 at *5 (emphasis added) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)). Although Target's share in the growth of the *consumer* tissue paper imports between 2002 and 2003 was significant (approximately [[ ]] percent), and Target's "new market" theory is appealing, there is also reasonable support in the record that domestic producers could and were willing to meet its needs during the period examined as the ITC found. *See* Confidential Views at 34.

### b. Cleo/Crystal's Imports

Cleo/Crystal argues that the majority of Commissioners "did not properly take into account the effect of Cleo/Crystal's supply interruption and subsequent plant closure in 2003, which were in no way due to subject imports, and of Cleo/Crystal's increased, non-injurious imports in 2003, which had become necessary, given the cessation of its domestic production." Cleo/Crystal S.J. Mem. 30. In October 2002, Cleo purchased Crystal, a tissue converter, and simultaneously entered into a renewable supply contract with [[ ]], Crystal's related paper-making company, for tissue stock (or jumbo rolls) to be delivered to Crystal's converting operation before the end of 2003.[11] *See* Cleo/Crystal's Post-Hr'g Br. (Jan. 12, 2005), App. at A-1 & Ex. 1 at 7-8, C.D. 440. However, in 2003, Cleo decided to terminate its production of

---

Report at I-11-I-12 & nn.56-58.

[11] As the record showed, Crystal was the largest domestic supplier of tissue paper in the U.S. market through [[ ]], when [[ ]]. Confidential Views at 13. Crystal had acquired its tissue rolls from [[ ]]. Cleo/Crystal S.J. Mem. 6.

consumer tissue following "the sudden and unexpected decision" by its supplier not to honor the supply contract and the loss of its supplier of rotogravure printing services. Cleo/Crystal S.J. Mem. 6. As a result, Cleo/Crystal claims that it could neither find an adequate source of roll stock, nor a new rotogravure printing company because only flexographic printing (inherently inferior in quality) was available in the United States. *See* Cleo/Crystal S.J. Mem. 24-25; Confidential Views 20-21. Consequently, Cleo/Crystal decided that its only viable option was to cease domestic production of consumer tissue and to increase imports.[12] *See* Cleo/Crystal's Post-Hr'g Br., App. at A-2, A-4–A-7; Cleo/Crystal S.J. Mem. 8.

Cleo/Crystal argues that instead of addressing this evidence, the majority of Commissioners improperly focused on what they believed Cleo/Crystal should have concluded regarding alternative domestic suppliers. Specifically, the Commission considered [[ ]] a viable supplier of roll stock and decided that Cleo/Crystal's printing needs could have been filled by domestically available flexographic printing. *See* Confidential Views at 20-21.

The parties do not dispute that as a result of its supplier's shutdown in 2003, Cleo/Crystal found itself in need of another supplier, but they disagree on whether Cleo/Crystal's decision to import resulted from the domestic industry's inability to meet its production needs. In parallel, Cleo/Crystal maintains that the cessation of its domestic production necessitated increased imports; thus, the requisite causal link between imports and injury under 19 U.S.C. § 1673d(b) cannot be met. *See* 19 U.S.C. § 1673d(b).

Indeed, in determining whether subject imports were significant under 19 U.S.C.

---

[12] In July 2003, [[ ]] purchased Crystal's bulk tissue business, but not its consumer tissue business. That is, [[ ]] purchased Crystal's [[ ]]. *See* Cleo/Crystal's Pre-Hr'g Br. (Dec. 2, 2004) at 14-15 & Ex. 3; C.D. 378, App. 9.

§ 1677(7)(C)(i), it is proper to consider the overarching requirement that there be a causal link between imports and injury required by 19 U.S.C. § 1673d(b). The ITC reasonably rejected Cleo/Crystal's claim that it imported significant amounts of subject consumer tissue paper in 2003 *only because* it experienced a raw material supply shortage in that year and the domestic industry could not meet its needs. Confidential Views at 19-21. First, the ITC found that even prior to Cleo's acquisition of Crystal, Cleo was already importing subject tissue paper [[    ]]. Final Results at 14. Cleo imported [[    ]] square meters of subject tissue paper from China in 2001 and then [[    ]] square meters in 2002. Final Results at 14; Amendment to Confidential Staff Report at Table III-1 n.3, C.D. 495. The ITC determined that this volume of imports constituted [[    ]] percent of its domestic production in that year. Final Results at 14; Amendment to Confidential Staff Report at Table III-1 n.3, C.D. 495. Thus, the Commission concluded that "Cleo was shifting substantial volumes of its sales to subject imports in 2001 and 2002, well before it experienced any raw materials shortage in 2003." Cleo/Crystal S.J. Mem. 30-31.

The Commission also found some evidence that, prior to the acquisition of its tissue paper operations by Cleo, Crystal believed that the subject imports were harming its tissue paper operations. Confidential Views at 19; *see, e.g.*, Revised Hr'g Tr. at 26-27 (Ted Tepe, Vice President, Seaman). In 2001, Crystal even sought legal advice concerning the possibility of filing an antidumping petition against the subject imports. Confidential Views at 19. In addition, at that time, Crystal's investment bankers also reported that [[    ]] Cleo Pre-Hr'g Br. Ex. 2 Tab. 5 at 41, C.D. 378 (excerpt from [[    ]] report). These pieces of evidence reasonably support the ITC's conclusion that Cleo/Crystal contemplated shifting its paper tissue supply from the United

States to China because it "viewed low-priced imports as a significant source of competition." Confidential Views at 19.

The Commission's finding that there was a viable domestic source of tissue paper also is supported by the record. The ITC considered [[    ]] because [[    ]]. Amendment to Confidential Staff Report at IV-8 n.24, C.D. 495. This evidence led the Commission to conclude that "Cleo was more interested in continuing to shift its tissue paper supply overseas than it was in seeking domestic sources of raw materials." Cleo/Crystal S.J. Mem. 31.

Similarly, the Commission's rejection of Cleo's claim that it began purchasing subject imports because it lost its rotogravure printing company has support in the record. First, the Commission found that "state-of-the-art flexographic printing, for which there is ample domestic capacity, meets quality requirements of the tissue paper industry." Confidential Views at 20-21 (citing [[    ]], USCIT Tel. Int. (Jan. 31, 2005), C.D. 481; Revised Hr'g Tr. at 40-41); *see* Revised Hr'g Tr. 84 (testimony of Mr. Garlock, President, Garlock Printing & Converting, Inc.) ("[W]e actually looked at Target's current tissue line and found that we could print just about any one of those designs flexographically."). The Commission also established that rotogravure printing, albeit of a slightly inferior quality than one available in China, was available in the United States. Confidential Views at 21 (citing Confidential Staff Report at IV-8); *see* [[    ]], USCIT Tel. Int. (Jan. 31, 2005).

In this case, the Commission gave more weight to the testimony and assertions proffered on behalf of certain domestic companies, such as [[    ]] and [[    ]], than those of Cleo/Crystal and Target. However, the court cannot re-evaluate evidence in this case. *See U.S. Steel Group*, 96 F.3d at 1357 ("It is the Commission's task to evaluate the evidence it collects during its

investigation. Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."). In particular, this Court cannot second-guess the ITC's credibility determinations unless there is evidence undermining those determinations. *See Nippon Steel Corp.*, 2006 WL 2290991, at *9 ("The assessment of the proper weight to accord to testimony is within the role of the Commission, not this court and not the Court of International Trade.").[13]

Both Cleo/Crystal and Target advanced rigorous arguments concerning the significance of their imports and their impact on the domestic industry. The Importer Comparison Data Run Sheet to a large extent supported their respective positions because Target's share of the growth of consumer tissue paper imports between 2002 and 2003 was approximately [[    ]] percent, and Cleo/Crystal's share about [[    ]] percent. *See* C.D. 498; *see also* Ct. Hr'g Tr. 21. The court acknowledges that business judgment played a significant role in the companies' decision to source their needs from China; however, the court is constrained by its standard of review to uphold the ITC's finding with respect to the significance of imports. *See Nippon Steel Corp.*, 2006 WL 2290991 at *5.

### 2. *The Effect of Subject Imports on Domestic Prices*

---

[13] During oral argument, the government advanced certain interpretations that it did not argue in its brief. It argued that the Commission's rejection of Cleo/Crystal's argument that at the time Cleo/Crystal made a business decision to import roll stock paper the domestic industry could not supply its demands was based on a credibility determination, which this Court cannot second-guess. Ct. Hr'g Tr. 39. The government explained that the Commission looked at the evidence and found roll stock available from domestic producers, specifically [[    ]], and concluded that Cleo/Crystal was wrong. Ct. Hr'g 39:2-14. Likewise, the government maintains that Cleo/Crystal's claim that the rotogravure printing could not be adequately replaced with flexographic printing was undermined by the Commission's credibility determination that there was not such a significant difference in quality between the two printing processes. Ct. Hr'g Tr. 41.

The statute further provides that in evaluating the price effects of subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii). The significance of underselling need not be based on a finding that underselling actually suppressed or depressed domestic prices. *See Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365-66 (2001).

The ITC considered pricing data for four tissue paper products. Product 1 was white tissue paper; product 2, solid color tissue paper (other than specialty tissue paper products); product 3, combination (four print and four solid color) tissue paper; and product 4, white bulk tissue. Confidential Views at 26; Confidential Staff Report at V-7, V-10 – V-12 Table V-2-V-5. The ITC found that subject imports undersold the domestic product by comparing data on domestic and importer prices for all four products. Confidential Views at 27. It found that the "[s]ubject imports undersold the domestic product in 33 quarters [out of 45] by a combined weighted average of [[   ]] percent." Confidential Views at 27 (citing C.D., P.D. at Table V-7 (as revised by Mem. INV-CC-019)). It found that "the pricing data show[ed] some evidence of price depression, but [did] not demonstrate significant price effects of imports on domestic prices." Confidential Views at 28. The Commission concluded that significant underselling by subject imports led to substantial declines in the domestic industry's market share.[14] Confidential

---

[14]

The large transfer of market share from domestic to Chinese producers is further

Views at 28-30.

Plaintiffs argue that the ITC's finding of underselling is not supported by substantial record evidence. Cleo/Crystal maintains that the ITC improperly combined price comparison data for all four products. Cleo/Crystal S.J. Mem. 33; *see* Target S.J. Mem. 39. Specifically, Cleo/Crystal claims that considering the data for each product separately shows no underselling. With respect to product 1, Cleo/Crystal's argument is straightforward. The majority found underselling in six of 15 quarterly comparisons, with margins ranging from [[    ]] percent to [[    ]] percent, Confidential Views at 27, indicating that underselling did not occur in nine of 15 comparisons. Regarding product 2, however, Cleo/Crystal's argument is tenuous. The Commission found that subject imports undersold the domestic product in 12 out of 13 comparisons, with quarterly average margins ranging from [[    ]] percent to [[    ]]. Confidential Views at 27. Cleo/Crystal claims that this finding is unsupported by substantial evidence because, as found by the dissenting Commissioners:

> The [[    ]]. In contrast, [[    ]]. Therefore, the limited comparisons preclude a probative analysis of the price data for product 2.

Dissenting Views at 24. Explaining that the tissue paper industry offers discounts based on increased purchasing volume, Confidential Staff Report at V-3, Cleo/Crystal maintains that "[[    ]]" Cleo/Crystal S.J. Mem. 34. However, looking at the relevant comparison table, the

---

borne out by the fact that eleven of twelve responding purchasers reported that since January 2001 they had shifted purchases from U.S. producers to Chinese importers. Three of nine stated that price was the reason for the shift, while one of seven stated that, since January 2001, U.S. producers reduced their prices in order to compete with prices of Chinese imports.
Confidential Views at 29. In further support of the ITC's position, [[    ]], reported that [[    ]]. Confidential Views at 29. Similarly, [[    ]]. Confidential Views at 29; Confidential Staff Report at Table V-9, V-19 – V-20, V-22.

numbers for U.S. sales to retailers are consistently higher than the numbers for the Chinese counterparts. *See* Confidential Staff Report at V-10 Table V-3. In addition, the quantity of U.S. sales to retailers declined, while the quantity of Chinese sales to retailers increased over the period examined. *See* Confidential Staff Report at V-10 Table V-3. Thus, while Plaintiff's argument is plausible, it fails to account for the entire data as it is subdivided with respect to retailers and distributors.

Regarding product 3, Plaintiff is correct that the U.S. sales data is available only for four quarters, making the comparison less meaningful. *See* Confidential Staff Report at V-11 Table V-4. As to product 4, Plaintiff concedes that the data supports the ITC's finding of underselling. Cleo/Crystal S.J. Mem. 35; *see* Confidential Staff Report V-12 Table V-5.

While viewing products 1 and 3 separately weakens the ITC's finding, the combined data supports its determination. As explained by the government, Plaintiffs appear to believe that the Commission's "aggregated" analysis involves making underselling comparisons between pricing products. The Commission, however, generally totals the number of underselling and overselling analyses for its pricing products in its analysis "in order to assess whether, as a whole, its price comparison data reflects consistent or prevalent price underselling throughout the market, as evidenced by the underselling data for its comparison products." Gov't Resp. 37; *see Altx, Inc.*, 167 F. Supp. 2d at 1365 ("The significance of underselling in an investigation will necessarily depend on the particulars of the product and industry at issue, not necessarily on the import of certain percentages understood in the abstract."); *see also Citrosuco*, 704 F. Supp. at 1087-88 (1988) ("[T]he Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under

investigation.").

### 3. *Impact on Affected Domestic Industry*

In examining "the impact of imports of [subject] merchandise on domestic producers of

domestic like products, but only in the context of production operations within the United

States," 19 U.S.C. § 1677(7)(B)(i)(III),

> the Commission shall evaluate all relevant economic factors which have a bearing
> on the state of the industry in the United States, including, but not limited to –
>
> (I) actual and potential decline in output, sales, market share, profits, productivity,
> return on investments, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories, employment,
> wages, growth, ability to raise capital, and investment,
> (IV) actual and potential negative effects on the existing development and
> production efforts of the domestic industry, including efforts to develop a
> derivative or more advanced version of the domestic like product, and
> (V) in a proceeding under part II of this subtitle, the magnitude of the margin of
> dumping.
>
> The Commission shall evaluate all relevant economic factors described in this
> clause within the context of the business cycle and conditions of competition that
> are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

The Commission concluded that subject imports of tissue paper had a significant impact

on the domestic industry. In its analysis, the Commission examined the production, trade, and

financial data of the domestic industry and concluded that the industry's condition declined

considerably during the period examined. Between 2001 and 2003, domestic output fell [[    ]]

percent, capacity utilization [[    ]] percent, domestic shipments [[    ]] percent, and net sales

[[    ]] percent. Confidential Views at 30-32. The number of workers employed by the industry

fell from [[    ]] to [[    ]] in the same period, and total wages declined as well. Confidential

Views at 31.  In addition, the industry's profitability levels simultaneously fell, with operating income falling from [[    ]] to [[    ]] and operating profit margins falling from [[    ]] percent to [[    ]] percent. Confidential Views at 32.

Cleo/Crystal claims that its decision to "shutdown [its plant] was not due to subject imports and, as a consequence, it would be a fatal analytical error to combine Cleo/Crystal's various declining business and financial indicators with the indicators of other domestic producers" in evaluating the impact of subject imports domestic industry.  Cleo/Crystal Reply 12. Specifically, it argues that "[i]n the consumer segment, the [[    ]]."  Cleo/Crystal S.J. Mem. 38 (citing Confidential Staff Report at C-8, Table C-3A, C-7, Confidential Staff Report).  For the same reason, Plaintiff invites the court to exclude Cleo/Crystal's imports data from the [SG&A[15] values for consumer and all tissue paper to show that SG&A values did not decline contrary to the ITC's findings].  Cleo/Crystal Reply 12.  Furthermore, Cleo/Crystal suggests that the Commission disregarded that the "[[    ]] not imports."  Cleo/Crystal Reply 12.

Plaintiff's argument for exclusion of its data from the Commission' calculations is faulty because it is based on a circular logic.  Only if the court rejects the ITC's reasonable finding that Cleo/Crystal's imports were significant does that argument stand.  As addressed earlier, the Commission reasonably found that record evidence did not support Cleo's claim that it was unable to replace its lost raw material supply or to obtain printing services domestically. Confidential Views at 33-34.  This finding, in turn, legitimizes the ITC's decision to include *all* domestic producers and resellers in its calculations, including Cleo/Crystal.  Further, the

---

[15]Selling, General, and Administrative Expenses.  Labor cost and SG&A are considered to be non-import causes of stress when evaluating industry conditions.  *See* Cleo/Crystal S.J. Mem. 37.

Commission found that the industry's increased costs during the POI did not account for the industry's declining sales and production volumes. *See* Gov't Resp. 39; Confidential Views at 34. Instead, sales declines exacerbated "the increased unit costs of the industry, which grew as production and sales volumes fell." Gov't Resp. 39 (citing Confidential Views at 34). Plaintiffs do not point to any evidence to contradict this conclusion.

Plaintiffs also argue that the ITC was incorrect in combining bulk tissue and consumer tissue data in analyzing the domestic industry trends. They insist that "even if, *arguendo*, there were only one like product, there are two distinct market segments in which consumer and bulk tissue paper are sold." Cleo/Crytal S.J. Mem. 37; *see* Cleo Reply 13 (arguing that "segment analysis" would be appropriate because Cleo/Crystal's operations were separated in terms of its bulk tissue and customer tissue production). The ITC considered separately the volume trends and pricing trends for bulk tissue paper and consumer tissue paper products in its analysis "when appropriate." Confidential Views at 17 n.84; *see e.g.*, Confidential Views at 17 (demand), 22-23 (substitutability). The ITC found that the two forms of tissue paper were not sufficiently differentiated to warrant treating them as constituting different market segments. Confidential Views at 17 n.84. The ITC's task is to assess whether the industry "as a whole" has been injured by the subject imports. *See Copperweld Corp. v. United States*, 12 CIT 148, 165-66, 682 F. Supp. 552, 569-70 (1988) (finding that language in 19 U.S.C. § 1673d(b)(1) and § 1677(4)(A) (1980 & Supp. 1986) "makes manifestly clear that Congress intended the ITC [sic] determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports"); *Nippon Steel Corp.*, 19 CIT at 471 (holding that ITC is not required to conduct specific segmented market analysis). Plaintiffs did not demonstrate how the ITC's decision not

to segment the markets for material injury is unsupported by record evidence or contrary to law.

Finally, Plaintiffs challenge the ITC's use of one set of financial data over another for

[[    ]] in evaluating the domestic industry's condition.  [[    ]] first submitted its 2003 financial

data for the fiscal year ending in June.  *See* Confidential Staff Report at VI-1 n.1.  That data did

not capture [[    ]] purchase of [[    ]] bulk business in July 2003.  *See* Target Resp. Letter 1;

Confidential Staff Report App. C.  Thus, while [[    ]] bulk sales volume disappeared from the

data, [[    ]] corresponding increase in production of bulk tissue does not appear in this data

submitted by [[    ]].  Target Resp. Letter 1; Confidential Staff Report App. C.  The ITC

requested that the [[    ]] submit data for fiscal year 2004.  *See* Confidential Staff Report at VI-1

n.1.  The ITC then prepared two sets of charts indicating trends in the domestic industry's

financial data from 2001 to 2003 using two different sets of data.  The first set of charts

incorporates the three years of financial data for [[    ]] ending with fiscal year 2003 results.  *See*

Confidential Staff Report Tables VI-1-VI-3 & App. C; *see* Gov't Resp. Letter 3.  The second set

covers the three years of financial data for [[    ]] ending with its fiscal year 2004 results.  *See*

Confidential Staff Report App. E.  Plaintiffs claim that the ITC should have used the 2004 fiscal

year data in its evaluation of the industry's performance.

In its analysis, the ITC considered both sets of data.  *See* Confidential Views at 32 n.165.

Importantly, both sets show notable declines in the industry's conditions during the POI.  For

example, looking at the first set of data, the domestic industry's net sales decreased from [[    ]]

square meters in 2001 to [[    ]] billion square meters in 2003, or [[    ]].  *See* Confidential Staff

Report Table C-1.  The second set of data indicates a decline from [[    ]] square meters in 2001

to [[    ]] square meters in 2003, or [[    ]] percent.  *See* Confidential Staff Report Table E-1.

Remand would be proper if the ITC relied on erroneous or incomplete data. *See, e.g.*, *Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*, Slip Op. 06-11, at 34-35, 2006 WL 270156 at **11-12 (CIT Jan. 23, 2006). However, other comparisons, such as profits and operating income, indicate that Plaintiffs did not demonstrate that the use of the alternative data for [[    ]] would have changed the ITC's conclusion that there were declines in domestic industry performance. *Compare* Confidential Staff Report Table C-1, *with* Confidential Staff Report Table E-1. Plaintiffs sidestep the ITC's finding that bulk and consumer tissue paper were part of the same like product, and pinpoint significant differences in numbers confined to the industry's bulk tissue paper operations. Plaintiffs do not show how the use of 2004 fiscal year data for [[    ]] would have changed the observed downward trends in operating performance of the domestic industry.[16] Even if significant bulk shipments were included in the financial data, the ITC's ultimate conclusion has sufficient support in that alternative data. *See* Confidential Staff Report Table E 1.

The use of the 2004 fiscal year data for [[    ]]. *See* Cleo/Crystal Resp. Letter 2;

---

[16] The court rejects Defendant and Defendant-Intervenor's interpretation of USCIT Rules 81(i) and 56.2(c) that Plaintiffs raised this argument before the court in a belated fashion. *See* Gov't Resp. Letter 4; Seaman Resp. Letter 1. Initially, Cleo/Crystal brought the issue to the court's attention with respect to the dissenting Commissioners' findings, arguing that their analysis of the bulk tissue industry was erroneous due to its use of the 2003 fiscal year financial data for [[    ]]. Thus, if the court were to adopt Plaintiffs' position that consumer and bulk tissue paper be analyzed separately, the court would have to use the 2004 fiscal year data for [[    ]]. *See* Cleo/Crystal S.J. Mem. 39 n. 102. Plaintiffs further pursued this argument and its variations in Cleo/Crystal's Reply Brief and during oral argument.

The parties do not dispute that this issue was properly raised in the administrative proceedings. *See* Target Resp. Letter 1-2; Cleo/Crystal Resp. Letter 1-2; Seaman Resp. Letter 2. Cleo/Crystal first raised the financial data issue in their post-hearing brief. *See* C.D. 422, at 10-12. After [[    ]] submitted financial data for fiscal year 2004 and the ITC reviewed it deciding to use the 2003 fiscal year data, Cleo/Crystal again raised the issue in its Final Comments. *See* Cleo/Crystal's Final Comments at 10-12, C.D. 514.

Confidential Staff Report at E-4 Table E-2. Capitalizing on this trend, Cleo/Crystal more specifically argued that this data, combined with consumer tissue data, covering all domestic producers except for Cleo/Crystal, would show positive trends. Cleo/Crystal Resp. Letter 3. The court rejects this argument because it is based on the premise that Cleo/Crystal should have been excluded from the investigation as a domestic producer and importer without sufficient evidence to support it.

The court finds that substantial evidence supports the Commission' finding that the domestic industry's performance declined over the period examined. The ITC determined that the domestic industry was materially injured based on declines in the industry's production, capacity utilization, shipments, sales, employment, and profitability levels – all indicating that the subject imports had a significant adverse impact on the domestic industry.

### CONCLUSION

Having reviewed the underlying record, this court concludes that the Commission's determination that consumer and bulk tissue paper constitute a single like product and that the domestic industry was injured as a result of increased imports of the subject merchandise is supported by substantial evidence and otherwise in accordance with law.


August 31, 2006                                              /s/ Judith M. Barzilay
_____                    _____
   New York, NY                                              Judith M. Barzilay, Judge

<u>ERRATA</u>

Please make the following changes to *Cleo Inc,* et al. *v. United States*, Consol. Court No. 05-00336, Slip. Op. 06-131 (CIT Aug. 31, 2006).


Page 3:        Replace "The period of investigation ("POI") was July 1, 2003" through December 31, 2003" with "The Commission's period of investigation ("POI") was January 1, 2001, through December 31, 2003."


Page 15:       In the last sentence of footnote 9, insert "that" between "and fact" and "products had only limited degree of interchangeability."


Page 25:       In the first full paragraph, replace "USCIT Tel. Int." with "USITC Tel. Int."


October 3, 2006